JACOB W. HUGG, Administrator of JACOB HUGG, deceased, *vs.* THE BALTIMORE AND CUBA SMELTING AND MINING COMPANY.

*General average—Freight on trans-shipped Cargo not subject for General average—Rule in case of Transshipment of portion of Cargo—Capacity in which the Master acts in case of trans-shipment.*

When a vessel puts into a port of distress, and there trans-ships a portion of her cargo, the freight paid the substituted bottom is not an expense or loss to be contributed for in general average.

If a ship is disabled from completing her voyage, the master must transship the cargo if he can, and he may then charge the *excess* of the cost of trans-shipment over his freight, to the owner of the goods; but the owner of the goods cannot be held answerable both for the whole freight originally contracted for, and the freight paid on the trans-shipped goods.

The costs of such trans-shipment cannot be charged in general average, on the ground that it was an expenditure for the benefit of all concerned, in substitution for a greater expenditure which the master had the right to incur by landing the cargo and repairing.

When a ship is disabled from completing her voyage, and the cargo is sent on to the port of destination by another vessel, at less cost than the original freight secured by the charter party, the master in sending it forward acts as agent of the ship owner in order to earn his full freight.

These principles apply to the case where a portion of the cargo is transshipped on a substituted bottom, and the residue is carried to its destination by the original bottom, as well as to the case of a total trans-shipment.

APPEAL from the Superior Court of Baltimore City.

The facts are given in the opinion of the Court.

The cause was argued before BARTOL, C. J., STEWART, BRENT and BOWIE, J.

Hugg, Adm'r, *vs.* Balt. and Cuba Smelting and Mining Co.

*Thomas H. Bevan* and *Wm. S. Waters*, for the appellant.

There are two questions involved in this appeal :

1st. Whether there is any evidence in the case upon which the plaintiff is entitled to a general average contribution in respect of the freight of " The Adelaide ?"

2d. Whether the plaintiff is entitled to recover the whole freight of " The Adelaide ?"

*First.*—As to the question of general average. Expenses incurred, sacrifices made, or damages sustained for the common benefit of ship, freight and cargo, constitute general average. These expenses, sacrifices and damages must grow out of a necessity occasioned by a peril of the sea, and must be attended with a deliberate purpose, with a view to the common benefit, and must be extraordinary and successful. *Birkley vs. Presgrave*, 1 *East*, 220 ; *Abbott on Shipping*, 474, 497, 498 ; *Nelson vs. Belmont*, 21 *New York*, 36 ; *Plummer vs. Wildman*, 3 *M. & S.*, 482 ; *Laws of Wisbuy*, Arts. 5, 55, 56, (1 *Pet. Ad. R., Appendix;*) *Marine Ordinances of France, Tit.* 7, *Art.* 2, (2 *Pet. Ad. R., App.*)

The claim in this case is for extraordinary expenses incurred in a port of necessity, with a view to the common benefit of ship, cargo and freight. The rule in America makes no distinction between the causes which brought the ship into a port of necessity, so that it is occasioned by a peril of the sea. The expenditure must only be extraordinary, and with a view to the common benefit. *Abbott on Shipping*, 497, 498 ; 1 *Pars. Sh. & Ad.*, 385.

There is evidence in this case tending to prove that the Maggie V. Hugg was in the port of Rio Janeiro from a necessity occasioned by a peril of the sea; and it was the duty of the master to act for the good of all, in order that ship, cargo and freight might all be saved. This is precisely the condition of things out of which the right to general average contribution arises. It springs out of no implied agreement among the several owners of ship and cargo, but is based upon a community of interest at the time of the sacrifice, expendi-

ture or loss. The authority of the master to act when the exigency of the case makes it necessary for him to act for the common good, cannot be doubted. 3 *Kent*, 210, 212; *Lemont vs. Lord*, 52 *Maine*, 365, 391; *The Copenhagen*, 1 *Rob. Ad.*, 243; *The Gratitudine*, 3 *Rob. Ad.*, 214; *Nelson vs. Belmont*, 21 *New York*, 40.

Was the freight paid the Adelaide, under the circumstances of this case, an extraordinary expense? The test of this is, was it such an expense as the owners were bound to incur by the terms of the charter-party under ordinary circumstances? The charter-party bound the owners to carry the goods in the Maggie V. Hugg. This was his ordinary duty, and the carrying of the goods in another ship is not within the ordinary scope of the contract, and never becomes a duty except when dictated by necessity. *Wilson vs. Bank of Victoria*, L. R., 2, Q. B., 213; 3 *Kent*, 236; *Plummer vs. Wildman*, 3 *M. & S.*, 482; 1 *Pars. Mar. Law.*, 298, 303; 1 *Pars. Sh. & Ad.*, 377, 381; *Lyon vs. Alvord*, 18 *Conn.*, 76; *Nelson vs. Belmont*, 21 N. Y., 40.

*Second.*—Suppose the freight of "The Adelaide" not the subject of general average contribution, is not the owner of the cargo responsible for it? *Hugg vs. Augusta Ins. Co.*, 7 *How.*, 609; *Abbott on Ship.*, 465, *note* 1; 3 *Kent*, 312; *Shipton vs. Thornton*, 9 *Ad. & Ell.*, 314; *Searle & Scovell*, 4 *Johns. Ch.*, 218; *Lemont vs. Lord*, 52 *Maine*, 386.

*Richard M. Venable* and *Daniel M. Thomas*, for the appellee.

The only question involved in this suit may be stated in the following words: When a vessel puts into a port of distress, and there trans-ships a portion of her cargo, is the freight paid the substituted bottom an expense or loss to be contributed for in general average?

This claim is made either on the principle that the expenditure was a substitution beneficial to all parties for a greater expenditure, which the ship master had a right to incur by

Hugg, Adm'r, *vs.* Balt. and Cuba Smelting and Mining Co.

repairing at Rio, and ought to be apportioned in the same way as the greater expenditure would have been; or as an extraordinary expenditure for the general advantage of all interests concerned.

As a substituted expense—The claim cannot be allowed on this ground. There is no legal principle on which expenses incurred by one course could be apportioned according to what might have been the facts if a different course had been adopted. *Wilson vs. Bank of Victoria, Law Rep.,* 2 *Q. B.,* 203.

As an original expense—There is no case to be found in the books where freight by a substituted bottom was contributed for in general average. The circumstances under which lost freight is apportioned, are stated in 1 *Parson's S. & A.,* 380, and *n.* 1. The two cases in which such contribution is made, are the case of a jettison and the case of a vessel lost by voluntary stranding. If the voyage be broken up in any other way than by a voluntary stranding, the freight lost is not contributed for. Contributors in general average are not insurers of freight. *Lee vs. Grinnell,* 5 *Duer,* 400, 432; *Nelson vs. Belmont,* 5 *Duer,* 310, 322, (21 *N. Y.,* 36;) *Columbia Ins. Co. vs. Ashby,* 13 *Pet.,* 343.

If by reason of wreck or other cause the master is unable to carry the goods to their destination in his own ship, he *must* trans-ship the goods, or send them to their destination in another bottom. 1 *Parson's S. & A.,* 235, 236; 3 *Kent's Com.,* 210–212; *Broadhurst vs. Columbian Ins. Co.,* 9 *Johns.,* 17; *Gaither vs. Myrick,* 9 *Md.,* 118, 137, 138.

In such cases the rule for the adjustment of the freight is well settled. "The cargo, on its arrival at the port of destination, is chargeable with the increase of freight arising from the charter of the new ship; that is, the extra freight beyond what the freight would have been under the original charter-party if the necessity of hiring another ship had not intervened. The owner of the goods is not responsible both for the old freight and the new." *Searle vs. Scovell,* 4 *Johns. Ch.,* 218.

It cannot be alleged that this rule is inapplicable when only a part of the cargo is trans-shipped. There is nothing in principle to distinguish the two cases. The necessity is no greater in one case than the other; and the duty of the master equally imperative. If there is any distinction, it is favorable to the view that this principle is more readily applicable to partial than to entire trans-shipments; for in cases of partial trans-shipments, in addition to the advantage accruing to the shipper from sending forward the cargo, the ship owner is benefited by saving something of his freight. If it be argued that when there is only a partial trans-shipment the voyage is saved, it is replied that an expense merely for securing the voyage is not to be contributed for. It is the safety of the cargo, and not of the voyage that constitutes the foundation of general average. *Columbian Ins. Co. vs. Ashby*, 13 *Pet.*, 331.

The obligation to trans-ship and the expense of trans-shipping, are imposed on the master and the ship owner by the charter-party. Every expense which the ship owner incurs *with the purpose of expediting or effecting the voyage,* be it usual or unusual, at sea or in port, is within his contract to transport. If a portion of the cargo is transferred to, and conveyed and delivered by, a substituted bottom, it is upon the original contract. 1 *Parson's S. & A.*, 236, *n.* (1.)

It is only when an expense is incurred to rescue, or connected with the rescue of a cargo from an impending peril, that a question of general average can arise. The expense of trans-shipment is unconnected with, remote from, and entirely independent of, the act of putting into port. No expense thus unconnected and remote has ever been allowed in general average. There is high authority directly to the point, that expenses incurred by trans-shipment are not general average loss, but fall on the cargo or on the ship, according to the circumstances of the case. 1 *Parson's S. & A.*, 402; 2 *Phillip's Ins.*, 1341; *Heyliger vs. N. Y. Firemen's Ins. Co.*, 11 *Johns.*, 84; *Lyon vs. Alvord*, 18 *Conn.*, 66.

This claim is wanting in almost all of the characteristics which distinguish those apportioned for in general average.

The law of general average is a branch of the law of agency. The master charges the respective interests with contribution by some act which he is authorized to do in virtue of his position as agent. He becomes habilitated with this agency, and entitled to charge the goods without a request from the owner, in consequence of the danger of the situation in which they are placed. 2 *Phillip Ins.*, 1296.

In order that he may charge the goods, there must be a sufficient necessity to raise an agency, and this the law is loth to do. *Lemont vs. Lord*, 27 *Maine*, 390, 393.

But when a vessel is in a port of necessity, and it becomes necessary to trans-ship, the capacity in which the master acts, is not now a subject for dispute. The origin, measure and extent of his agency are given in 1 *Parson's S. & A.*, 236, and in *Lemont vs. Lord*, 52 *Maine*, 390. If there is a total abandonment of the ship, he trans-ships as the agent of the owner of the cargo, but so long as there is a possibility of earning any freight for the ship owner he acts as his agent. In this case there were forty shillings freight earned on each trans-shipped ton for the owner of the vessel; and in making the trans-shipment the master acted as his agent, and not as the agent of the owner of the cargo so as to subject him to a charge under the law of general average. 52 *Maine*, 391; 1 *Parson's S. & A.*, 197, 198, *n.*; 3 *Wall.*, 347.

Without bringing the cargo to its destination no freight could be earned. And the benefit that the owner of the Hugg derived from the trans-shipment was that he thereby earned his freight.

Bartol, C. J., delivered the opinion of the Court.

This suit was instituted to recover a sum claimed to be due the appellant's intestate, for contribution in general average, under a contract of affreightment.

The original shipment by charter-party, was of a cargo of copper ore, six hundred and seventy-nine tons, on board the

*Maggie V. Hugg,* a vessel belonging to the appellant's intestate, from Taltal, in Chili, to the port of Baltimore, at a freight of £3. 10s. per ton. The contract contained the usual exception of the dangers and accidents of the seas. After encountering rough weather, it was discovered that the ship was leaking badly, and the master made for the Falkland Islands. There upon consultation with the crew, it was determined to proceed to *Rio de Janeiro,* and the vessel entered that port on the 24th day of December, 1864. There the captain noted a protest, and solicited a board of survey; who after an inspection of the vessel, in their report recommended "that she be lightened, say four hundred or five hundred tons, and that the same be shipped to port of destination to avoid heavy cost of landing, warehousing and attendant expenses upon the same.

Pursuant to this recommendation a ship called the *Adelaide* was chartered, and three hundred tons of ore were transshipped, and sent by her to Baltimore; the freight to be paid thereon at the rate of thirty shillings per ton. Both vessels then proceeded to Baltimore and delivered their cargoes, and the appellee paid freight on all the ore delivered, at the rate of £3. 10s. per ton, the freight originally agreed on.

Captain Hugg then submitted the expenses incurred by the *Maggie V. Hugg,* during her voyage, to Thomas H. Norris, an average adjuster in Baltimore, who made out a statement by which $8,039.76 was charged as the amount to be paid, in general average by the cargo—$2,746.27 of that sum being made up by bringing into the general average account the freight paid the *Adelaide.*

The appellee not being satisfied with this statement, submitted it to Bird & Wilson, average adjusters in New York, who prepared an amended statement, by which it appeared that the cargo was liable for $5,143.70 in general average; this sum was accordingly paid.

By the agreement of counsel in the Court below and in this Court, all other questions in dispute have been adjusted,

and it is conceded that the payments made by the appellee to the appellant's intestate, covered all that was due, if the freight paid the *Adelaide* be not taken into the general average; otherwise there is due the further sum of $2,746.27.

The only question presented by this appeal is thus succinctly stated in the appellee's brief:

"When a vessel puts into a port of distress, and there trans-ships a portion of her cargo, is the freight paid the substituted bottom, an expense or loss to be contributed for in general average?"

In the argument, the appellant's counsel stated as an alternative proposition, that if the freight of *The Adelaide* was not the subject of general average contribution, then the owner of the cargo is responsible for it all. But we find no authority which supports the position that in case of trans-shipment of cargo from a port of necessity, the shipper is chargeable with the freight in the substituted bottom, in addition to that originally contracted to be paid. In contracts of affreightment the general rule as stated by Chancellor KENT is "that the delivery of the goods at the place of destination, according to the charter-party, is necessary to entitle the owner of the vessel to freight. The conveyance and delivery of the cargo form a condition precedent, and must be fulfilled." 3 *Kent's Com.*, 219, *m.*

If the ship be disabled from completing the voyage the freight may be earned by forwarding the cargo by another vessel. 1 *Parson's S. & A.*, 233, 234; *Luke vs. Lyde*, 2 *Burr.*, 882, 887; *Shipton vs. Thornton*, 9 *Ad. & E.*, 314.

In such case, the captain may stipulate for the payment to the substituted vessel, of a higher freight than that originally contracted for, and the cargo will be answerable for such increased freight. For it is held that in such case the captain acts from necessity as agent for all concerned; and as such may bind the owner of the cargo by his contract of trans-shipment. In *Rossette vs. Gurney*, 11 *C. B.*, (73 *E. C. L.*, 176,) JERVIS, C. J., said: "It may happen that a new

bottom can only be obtained at a freight higher than the original rate of freight. It does not seem to have been settled whether the ship owner may charge the cargo with the additional freight."

But the rule, as we have stated it, is well settled in this country. It is laid down by Chancellor KENT, 3 *Com.*, 212, *m.*, and recognized by the Supreme Court in *Hugg vs. Augusta and Banking Ins Co.*, 7 *How.*, 609, and by numerous decisions of State Courts, which will be found collected in the notes to 1 *Parson's S. & A.*, 236, 237.

It will be found by examination of these cases that while it has been held that the *increased* freight may be charged to the cargo, the meaning is that the hire of another vessel may be so· chargeable, even though it exceeds the freight payable under the charter, not that the cargo can be held liable for both the new and the old freights combined. "The rule," says *Parsons*, "as usually expressed is, that the master must trans-ship if he can, and may then charge the *excess* of the cost of trans-shipment over his freight to the owner of the goods." 1 *Parson's S. & A.*, 235, 236.

The rule is stated in the same way by Chancellor KENT, in *Searle & Adams vs. Scovell*, 4 *Johnson's Ch. R.*, 218, a leading case on this subject. On page 226, the Chancellor says, "I understand from the *French* books that the *extra* freight means the surplus beyond what the freight would have been by the original charter-party, if no necessity of hiring another ship had intervened. The owner of the goods is not responsible for the old and new freight united." In this case there was no extra freight paid. It is very clear, both upon reason and authority, that the appellee having paid the whole freight originally contracted for under the charter-party, cannot be held answerable in addition, for the freight paid on the portion of the cargo forwarded from Rio to Baltimore by the Adelaide.

The question then recurs, can it be charged in general average as an extraordinary expenditure incurred for the benefit of all concerned? This claim cannot, in our opinion, be sup-

ported on the ground that it was an expenditure for the benefit of all concerned, in substitution for a greater expenditure which the captain had a right to incur by landing the cargo and repairing at Rio.

This point was expressly decided in *Wilson vs. Bank of Victoria, Law Rep.*, 2 Q. B., 203. In that case it was sought to charge in general average, certain extraordinary expenses incurred in buying coal; because, as it was argued, the money so expended "was an expenditure to prevent the necessity of unshipping the cargo at Rio, and therefore ought to be charged against the same interests, and in the same proportions, as the expenditure which it prevented would have been charged."

In answer to this, the Court, while they guard against expressing any opinion upon the question, whether under the circumstances of that case, the ship-owners could have charged the owners of the cargo with any part of the expenses of unshipping and warehousing the cargo, as a point which did not arise, go on to say: "But passing this by; we think that the expenses actually incurred must be apportioned according to the facts that actually happened, and that there is no legal principle on which they can be apportioned, according to what might have been the fact, if a different course had been pursued."

We think that proposition is unquestionably sound, and directly applicable to this case. The captain of the *Hugg*, having elected to trans-ship a portion of the cargo on another vessel, and not to repair; the rights of the parties must be governed by the principles applicable to the case of transshipment, and not to the case which might have arisen, if the cargo had been landed and the ship repaired at Rio.

Is it then, under the circumstances of the case, such an expenditure as constitutes a claim for general average contribution? No case has been cited by counsel, nor have we found any, in which such an item has been estimated as a general average loss or expense. The absence of precedent

in support of the appellant's claim .is a strong argument against it, for many similar cases must have occurred. But in addition to this, the authorities, so far as they are applicable, appear to be against it; and it seems to us that upon principle, the claim ought to be disallowed, as not coming within the reasons upon which general average losses are ascertained: "Sacrifices voluntarily made in the course of the voyage, of part of the ship or cargo, to save the residue of the adventure from impending peril or extraordinary expenses incurred for the benefit of both ship and cargo, and which became necessary in consequence of a common peril, are usually regarded as the proper subjects of general average," by Justice CLIFFORD in *McAndrews vs. Thatcher*, 3 .*Wallace*, 365. The learned Judge further remarks: "All losses which give a claim to general average contribution, says a standard writer upon the law of insurance, may be divided into two great classes:

"1. Those which arise from sacrifices of part of the ship or part of the cargo, purposely made in order to save the whole adventure from perishing.

. "2. Those which arise out of extraordinary expenses incurred, for the joint benefit of both ship and cargo," and cites 2 *Arnould on Insurance*, 881.

The claim in this case if it exist at all, comes within the second class; and on this ground it is placed in the argument of the appellant, who contends that the freight paid *The Adelaide*, was "an .extraordinary expenditure for the joint benefit of both ship and cargo."

It is perfectly well settled that if the ship is wrecked, or from perils of the sea becomes totally disabled, so that the voyage is broken up, the expense of sending the cargo forward by another vessel is not a general average charge.

In *Parson's Sh. & A.*, 402.the law is thus correctly stated:

"The master, if by wreck or other cause, he is unable to carry the goods to their destination in his own ship, always may, and by the weight of American authority, must, if he

can, trans-ship the goods, or send them to their destination in another bottom. *The expense incurred by doing this is not a general average loss, but falls on the cargo or on the ship, according to the circumstances of the case.*" In support of this last proposition the author cites *Heyliger vs. N. Y. Fireman's Ins. Co.*, 11 *Johnson*, 85, *and Lyon vs. Alvord*, 18 *Conn.* 66. In the first of these cases, a ship bound for New York was stranded on the coast of New Jersey. In the effort to save the ship and cargo, lighters were procured. The ship was lost, but the cargo was saved, and sent to New York in the lighters. It was held that the cost of the lighters was chargeable in general average, it being an expense incurred for the common benefit. The Court say : " The expense of conveyance, in another vessel or boat, strictly so considered, ought to fall on the ship-owner, and not on the shipper of the goods. But this was not that case. The vessel was stranded and the cargo and vessel in jeopardy, and here was a joint effort and expense for the recovery of both, and the ship was lost and the cargo only saved. The expense of removing the cargo from the place of the shipwreck to the port of New York may have been a small item of itself, but it is not separated and stated in the case."

In *Phillips on Ins. vol.* 2, *sec.* 13, the author in treating of general average expenses says : " The expense of forwarding a wrecked cargo by another conveyance to the port of destination is not included in the contribution "—cites in the note *Heyliger vs. N. Y. F. Ins. Co.*, 11 *Johnson*, and says : " The small expense of transporting the cargo from Shrewsbury to New York was included ; but the Court seems to admit that it could not properly be included."

The rules governing questions of this kind rest upon the law of agency. "The master charges the respective interests with contribution by some act which he is authorized to do in virtue of his position as agent for the parties concerned."

When the ship is disabled from completing the voyage, and the cargo is sent on to the port of destination by another

vessel at less cost than the original freight secured by the charter-party, the captain in sending it forward, obviously acts as the agent of the ship-owner, for thereby he is enabled to earn his full freight.

As was said by JERVIS, C. J., in *Rossette vs. Gurney*, 11 *Q. B.*, before cited: "If the master trans-ships because the original ship is irreparably damaged, without considering whether he is bound to trans-ship or merely *at liberty* to do so, it is clear that he trans-ships to earn his full freight, and so the delivery takes place upon the original contract."

It follows from this, that the trans-shipment being made under and in fulfilment of the original contract made by the ship owner, *and for the purpose of earning full freight*, that in the trans-shipment, the captain acts as his agent and for his benefit, and not as agent of the owner of the cargo; as we have seen he may do; under circumstances in which the ship owner is not interested in the trans-shipment, because no freight can be earned for his benefit; by reason of the cost of trans-shipment exceeding the original freight payable under the charter-party. But where as in this case, the freight from the port of necessity to the port of destination, is less than the original freight stipulated for in the charter-party, the cost of trans-shipment falls upon the ship owner, and is designated in the insurance law not as *a general average loss*, but as a *particular average on freight*, or as a loss on freight for which the underwriter is bound; and so the law is stated by *Phillips* in his work on *Insurance. In vol.* 2, *sec.* 1438, the author says: "A particular average or partial loss on freight is occasioned by the loss of the ship after a part of the voyage is performed, which makes it necessary to hire another ship to carry on the cargo to the port of destination in order to earn the freight." And in *sec.* 1441: "In case of goods being transported for a part of the voyage only by the ship, of which the freight is insured, and a freight *pro rata itineris peracti* is earned, the loss is computed by deducting from the gross freight the actual or estimated expense of forwarding the goods to the port of destination."

Hugg, Adm'r, *vs.* Balt. and Cuba Smelting and Mining Co.

It follows from these authorities that if the *Hugg* had been altogether disabled from completing her voyage, and the whole cargo had been sent on by *The Adelaide*, at the freight of thirty shillings per ton, that this expenditure could not be charged in general average, but would have fallen upon the ship owner, and would be what is called in the books "*a particular average*," or loss on freight covered by his policy on freight.

It has been argued by the appellant, that the present case does not fall within the operation of this rule, because only a part of the cargo was trans-shipped by *The Adelaide*, and the *Maggie V. Hugg* was not wrecked or altogether disabled, but completed her voyage and carried a portion of the cargo to the port of destination in safety.  But we can see no good reason for this distinction.

The test is, in what capacity does the captain act in incurring the expense, and for whose benefit?  In trans-shipping by *The Adelaide* three hundred tons, at thirty shillings *per ton*, and thereby earning seventy shillings per ton on the whole cargo, the captain acted exclusively as the agent of the ship owner, and for his benefit, for the purpose of earning his full freight; and thus one essential element is wanting to bring it within the rules of *general average*.  It is not an expenditure for the common benefit of both ship and cargo."

The ruling of the Court below being in conformity with the views above stated; the judgment will be affirmed.

*Judgment affirmed.*

(Decided 19th March, 1872.)