## SHOE v. CRAIG et al.

(District Court, E. D. Pennsylvania. February 20, 1911.)

No. 46.

1. **SHIPPING (§ 194*)—GENERAL AVERAGE—EXPENSES WHICH MAY BE INCLUDED.**

A vessel's expenses from the time of disability to proceed on her voyage, together with the cost of temporary repairs which enable her to finish the voyage, are a proper charge in general average.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 613 617; Dec. Dig. § 194.*]

2. **SHIPPING (§ 194*)— GENERAL AVERAGE—EXPENSES WHICH MAY BE INCLUDED—SUBSTITUTED EXPENSE.**

A vessel during voyage was disabled in a storm, and her condition compelled the master to seek refuge at the nearest port. Temporary repairs

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

could not there be made, but could be made at a point 90 miles away, whence she might then have completed her voyage under sail. The master communicated with the owner and acted under his orders, but neither of them gave any notice to a consignee of freight, though his offices were only a few blocks from the offices of the owner. *Held*, that the cost of towage from the port of refuge to the port of destination, and cost of securing the tug and charges for wages and provisions, were not a charge in general average.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 613–617; Dec. Dig. § 194.*]

3. SHIPPING (§ 199*)—GENERAL AVERAGE—VALUE OF CARGO FOR PURPOSES OF CONTRIBUTION.

The value of the cargo for purposes of contribution in general average is properly reckoned as of the port of destination, in the absence of any custom to reckon it at the invoice value.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 625–630; Dec. Dig. § 199.*

General average, see notes to Pacific Mail Steamship Co. v. New York, N. & R. Min. Co., 20 C. C. A. 357; The Santa Ana, 84 C. C. A. 316; British & Foreign M. Ins. Co. v. Maldona & Co., 106 C. C. A. 133.]

In Admiralty. Suit by Bonaparte Shoe, managing owner of the Matilda D. Borda, against George F. Craig and another. Decree for libelant.

John F. Lewis and Francis C. Adler, for libelant.
Howard M. Long and Theodore M. Etting, for respondents.

J. B. McPHERSON, District Judge. This is a suit to enforce contribution in general average. The following facts are either conceded or established by the evidence:

The wooden schooner Matilda D. Borda—165 feet long, 39 feet beam, 1,200 tons gross, drawing about 19 feet when loaded—sailed from Fernandina, Fla., on February 5, 1906, bound for Philadelphia. Her only cargo was 541,900 feet of lumber, consigned to the respondents, on which the freight was $5.25 per 1,000 feet, or $2,844.93. The lumber has been delivered, and the freight has been paid, but $1,045.15 is also claimed from the consignees as a general average contribution, and a large part of this amount is in dispute. A few days after leaving Fernandina the schooner encountered a violent storm, and on February 12th she broke her tiller and loosened her rudder post to such an extent that she soon began to leak badly, and her condition compelled the master to bear away for Charleston, which was the nearest port of refuge. She arrived on February 14th and remained until March 9th, when she started for Philadelphia in tow of the tug North America which the libelant had sent from this city for that purpose. A diver had been employed at Charleston to examine the vessel and stop the leaks, but his efforts were only partly successful. After some delay, for which I think the master was not to blame, the tiller was repaired at the Riverside Iron Works, but proper temporary repairs to the rudder post could not be made without hauling the schooner out, and no dock or railway adequate to such work on so large a vessel existed at Charleston. She could have been hauled out

and temporarily repaired at Savannah, about 90 miles distant, and might then have completed her voyage under sail, but such repairs could not be made at Charleston, although the work done there by the diver sufficed to allow her to be towed to Philadelphia. There was, however, some risk even about proceeding under tow, but fortunately the weather was fine and the voyage was successfully accomplished. The master communicated frequently with the libelant, and acted substantially under his orders; but neither of them gave any information to the respondents until the arrival of the vessel at Philadelphia, although the libelant and the respondents both live in this city, and have offices only a few blocks apart. No survey was held at Charleston, and the master made no effort to ascertain the cost of unloading and storing the cargo, and of repairing at Savannah. When the schooner arrived at Philadelphia the respondents gave a general average bond conditioned, inter alia, to pay their proportion of the loss and damage, "Provided such losses and expenses aforementioned be stated and apportioned by Philip Justus, adjuster of marine losses, conformably to law and the usages of this port in similar cases." The adjustment was made by Mr. Justus, and several items are now disputed, on the ground that they were included contrary to "law and the usages of this port in similar cases."

The principal item is $1,200 for the tug. This amount is reasonable, but the respondents seek to raise the preliminary question, whether the cost of towing from a port of refuge to the port of destination is a general average expense in any case. I shall not decide the broad proposition, but shall consider only the facts now presented. Undoubtedly the vessel was disabled from proceeding upon her voyage under sail, and was justified in seeking a port of refuge.

[1] This is conceded, and it follows that the vessel's expenses from the time she bore away, and the cost of such temporary repairs as would have enabled her to finish the voyage under sail, would have been a proper charge in general average. Hobson v. Lord, 92 U. S. 407, 408, 23 L. Ed. 613; Star of Hope, 76 U. S. 236, 19 L. Ed. 638. If no other course had been reasonably open, the master might have unloaded the cargo, have had the schooner towed to Savannah, temporarily repaired, have returned to Charleston and reloaded the lumber—all at the cost of the various interests concerned. But this would undoubtedly have been expensive; it would probably have cost more than was paid for the towage to Philadelphia, and the question may therefore be stated in this form: Was the master justified in towing, in view of the probable saving in cost? This depends upon whether the towing was a general average act, or was undertaken for the benefit of only one interest, namely, the freight. As it seems to me, the evidence shows clearly that the master and the managing owner were acting solely in the interest of the freight, and were mainly anxious that the ship should finish her voyage in order to earn the full amount. They declined to have the ship surveyed, which would have been the usual course under the circumstances, evidently because they were unwilling to risk a recommendation with which they might not find it convenient or advantageous to comply. The

master declared that he did not consider himself to be agent for the consignees, and neither he nor the libelant notified the consignees, nor had any conference with them, although they were easily accessible, at least to the libelant, and had a direct and considerable interest in the situation. The master did not even ask what the cost of unloading at Charleston would be; did not inquire of "anybody in particular" what wharves were available there for unloading the lumber; made no inquiries about lighters, so far as appears, or about the cost of towing to Savannah, or about the facilities at that port; and made no effort to hire a tug at the neighboring ports of Savannah or Wilmington, although he may perhaps have inquired in Charleston without success. He seems to have been content to transfer the responsibility largely to the libelant in Philadelphia, and the libelant did what he thought best for the interest of the freight without conference with the consignees or the underwriters.

[2]. Of course the cost of towage from Charleston to Philadelphia would not in any event be a general average charge, strictly so called, but in a proper case it might be what is known as "a substituted expense." The rules governing the allowance of such expenses are not yet definitely settled, as may be seen by consulting Gourlie on General Average, p. 239 et seq., and page 337; Lowndes on General Average (4th Ed) p. 225 et seq.; Hugg v. Baltimore, etc., Co., 35 Md. 414, 6 Am. Rep. 425; Swan v. Chandler, 36 Hun (N. Y.) 192; Goodwillie v. McCarthy, 45 Ill. 186; Wilson v. Bank of Victoria, Law Reports, 2 Queen's Bench, 202; Re 928 Barrels of Salt, Fed. Cas. No. 10,272; 36 Cyc. 391, 392, note 85; and 14 American & English Encyclopedia of Law, pp. 977–979.

The tendency is apparently toward the allowance of substituted expenses, but the subject needs cautious treatment. In the existing condition of the law I do not believe that a substituted expense is ever allowable in general average unless all parties in interest have first agreed to it. The master's power to bind all interests may properly support such charges, if he has acted in good faith and without the opportunity of consulting those who may be affected by his act. It may easily be impracticable to confer with all the consignees of a general cargo, for example; and circumstances may also be such that he must act promptly on his own judgment without consulting any interest—either ship, freight or cargo; but in these days of easy communication by telegraph and telephone, there is usually no difficulty about consultation, and where this is true I think good faith requires, prima facie at least, that notice should be given. In such a situation the lack of any effort to communicate may well furnish ground for the inference that the course actually taken was intended to advance a particular interest, and not the interest of all. In the present case I think this inference should be drawn. As already stated, the course adopted by the master (which was evidently dictated by the managing owner) seems to have been taken in the interest of the freight alone, and therefore the cost cannot be brought into general average.

The charge of $25 for securing the tug must fall with the cost of towing, and a part also of the charge for wages and provisions. It

is a little difficult to fix a day after which this charge should cease, but I think it is probably fair to say, February 26th. The items of interest and commissions must also be proportionately reduced.

[3] In my opinion, the value of the cargo for purposes of contribution was properly reckoned as of the port of destination. No custom to reckon it at the invoice value was proved to prevail in Philadelphia, and the other method is supported by ample, although not by universal, authority. Girard v. Ware, Pet. (C. C.) 142, Fed. Cas. No. 5,460; Barnard v. Adams, 10 How. 270, 306, 13 L. Ed. 417; Bradley v. Cargo (D. C.) 29 Fed. 648; Wheaton v. Insurance Co. (D. C.) 39 Fed. 879; 14 American & English Encyclopedia of Law (2d Ed.) 991, and cases cited in notes; 36 Cyc. 400, and note 38.

The costs should be apportioned, and the libelant should pay three-fourths of the total, and the respondents one-fourth.

The adjustment must be modified in accordance with this opinion, and a reduced decree in the proper amount may then be entered in favor of the libelant.