## KOPPEL INDUSTRIAL CAR & EQUIPMENT CO. v. BALTIMORE S. S. CO.

(District Court, D. Maryland.   February 15, 1923.)

1. **Shipping ⬦118, 126—Neither shipper nor carrier held entitled to recover from the other for delay in discharging or improper handling, due to unusual conditions at port of discharge.**

Delay in discharging a shipment of knocked-down railroad cars at a Cuban port, and improper stowage of the cargo on the wharf when unloaded, *held* due to the unusual congestion of the port and unusual financial and industrial conditions prevailing there at the time, which gave neither shipper nor carrier valid claims for damages against the other.

2. **Shipping ⬦132(5)—Evidence held not to show damage to cargo from improper unloading and handling.**

A shipper, which permitted its goods to remain on the wharf where it was unloaded in a Cuban port for several months, *held* not to have sustained the burden of proving what, if any, damage resulted from unskillful handling and stowage when they are unloaded.

3. **Shipping ⬦142—Provision in bills of lading limiting time for bringing suit for damages held valid.**

Provision of bills of lading requiring suit for damage to cargo to be brought within three months *held* reasonable and valid under the circumstances of the case.

In Admiralty.   Suit by the Koppel Industrial Car & Equipment Company against the Baltimore Steamship Company, with cross-libel. Libel and cross-libel dismissed.

Janney, Stuart & Ober, of Baltimore, Md., and Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, for libelant.

George Forbes and John Phelps, both of Baltimore, Md., for respondent.

ROSE, Circuit Judge. [1] In October, 1920, the libelant, a Pennsylvania corporation, shipped from Baltimore to Matanzas, Cuba, by the steamships Lake Ontario and Lake Galata, belonging to the respondent, a corporation under the laws of Maryland, 50 knocked-down steel railroad cars in parts.   There were in these shipments an aggregate of 476 packages, weighing in all something over 771 tons.   The libelant had contracted to sell and deliver them at Matanzas to a citizen of Cuba, who had been engaged in extensive operations and had been reputed to control large resources.   Nevertheless the libelant had the bills of lading issued to its own order.   The steamships arrived at their port of discharge on the 24th and 26th of November, 1920, respectively.   At that time financial and industrial conditions in Cuba were very bad.   On the 10th of the preceding month a moratorium had been declared, with the natural result that ready money was of the scarcest, and there was no market for anything.   There was necessarily much delay in unloading ships and in paying duties.   The congestion of harbors, lighters, wharves, and bonded warehouses was extreme.   For these and other reasons, the steamships were slow in delivering the rest of their general cargo, all or most of which had been

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

stowed above the libelant's cars, and it was not until the 15th of December, or thereabouts, that these other goods were gotten out of the ships, which then became anxious to complete their unloading.

Difficulties, both physical and financial, were in the way. The respondent's agents at Matanzas had a wharf upon which there was a sufficiently powerful crane, and which also had the benefit of railroad connections. This wharf was, however, not bonded, and special arrangements had to be made before any dutiable goods could be landed upon it. Then there was the government or custom house wharf, at which, in regular course, imported merchandise was discharged and held until the duties were paid. It so happened at Matanzas this wharf was seldom used for very heavy material, such as these cars were, and it was at the moment unusually crowded; all the more, because the outer end of it was then, and had been for some time, in process of reconstruction; nor was it equipped with a crane. Ships of the draft of the Lake Ontario and the Lake Galata could not approach either of these piers, and, if anything was to be landed on them, it necessarily had to be first transferred to lighters.

The testimony leaves no doubt in my mind that at the time there was great hesitation in using the booms of the Lake Ontario, and perhaps of the Lake Galata as well, for unloading such excessively heavy material, and in spite of a good deal of testimony offered by the respondent to the contrary, I seriously doubt whether it would have been expedient to have made the attempt. At all events, I do not believe that anybody at the time wanted to. Only one of the two floating cranes in the harbor then appeared to be in condition for such use. It belonged to the contractors who were reconstructing the custom house wharf, and they were in the habit, when they did not need it themselves, of hiring it out for $25 an hour to those who had use for it. Perhaps it could have been had in December, but the ships did not ask for it until the 21st or 22d of January, when they promptly obtained it.

The cars could not, of course, be landed on the unbonded wharf until the duties on them were paid, and there would necessarily have been difficulties in paying the duties before the merchandise was taken out of the ships. These obstacles might have been gotten around by what is known in Cuba as making quedan; that is, by paying the amount of the duties estimated on the invoices and 25 per cent. extra to secure the government that upon final liquidation it would have in its hands all that was coming to it. If I understand correctly, if this extra 25 per cent. was paid in cash, good bond might be given for the duties, which amounted to some $25,000. Nobody interested in the shipment wanted to lay out so much at the time, with conditions as they were in Cuba, and it is not too much to say that the person who was under the most direct obligation to make the payment was not then, nor at any time thereafter, either able to do so or to furnish security that he would. Under such circumstances, the only place at which the goods could be landed was the custom house wharf.

One of the officers of the respondent, worried at the long detention of the ships in Cuban waters, came from Baltimore. The vessels

belonged to the Shipping Board, and the official of the respondent, on his arrival in Havana, sought the aid of its representative, who speedily succeeded in obtaining an order from the treasury officials in Havana to the director of the customs at Matanzas to permit the landing of the car parts on the government wharf. As things were, however, there was very little space on that wharf at the time available, and that was on the apron or outer edge of the pier. As the result of the energetic action of the agent from this city, the wharf contractor's floating crane was hired and the goods were gotten out of the ships and piled in quite a disorderly fashion in the small available space at the end of the wharf. This task was completed about January 29, and there the goods stayed until the end of the succeeding August.

For some months after the landing had been completed, none of the parties seems to have been conscious that it had any grievance against any of the others. It was not until May 26 the libelant made a complaint to the respondent that its goods had been so negligently and unskillfully landed and stored on the wharf that much damage had resulted. The respondent expressed surprise and incredulity, although it promised to look into the matter, and it was not until August, and in response to repeated requests, that it gave a definite answer. It then denied that there had been any appreciable damage done, and for the first time suggested that it might have a claim against the libelant for the detention of the ships, and quite plainly hinted that it would be prudent on the part of the libelant to drop its demand altogether.

Libelant, instead of taking this advice, on September 23, 1921, nearly four months after it made its first complaint to the respondent, filed its libel, in which it estimated the damage done at upwards of $20,000. The respondent then waited something more than seven months before filing a cross-libel, in which it claimed $108,000 for the detention of its steamers. Not to be outdone, the libelant on the 30th of June came back with an amendment to its original libel, in which it charged that the combined effects of the delay in discharging the cargo and the physical damage done in the course of the discharge had practically destroyed the value of its merchandise and had damaged it to the extent of $160,700. Much evidence has been taken, some of it by deposition, not a little of it in open court. The libelant has attempted to show that, if the cargo had been promptly landed, the Cuban purchaser would have paid, not only the duties, but the price of the cars as well, or that, if he had not done so, their market price at that time was very much greater than that which they have commanded at any subsequent period.

It is very doubtful if the latter fact is true, or that there was at any time, for many months after October 10, 1920, a real market in Cuba for such goods; but it is entirely immaterial whether there was or was not. At that time the libelant was not in a position to dispose of the cars to any other than their original purchaser. On January 8th, as a result of negotiations with him, the contract between them was changed from one of purchase and sale to one of lease, and at

that time the bills of lading and shipping documents were indorsed and delivered to him. A little while later, in April, he was formally adjudicated a bankrupt, and shortly thereafter betook himself to parts unknown. There was some litigation between the libelant and the trustee in bankruptcy, but in the end the former was held entitled to the cars. There was never any time after the ships arrived at Matanzas that the purchaser either would or could have paid for them.

The libelant's claim for anything other than reimbursement for such actual damage as was done to the car parts is without shadow of substance, nor is there, to my apprehension, much more merit in the respondent's contention that it is entitled to demurrage, or damage in the nature of demurrage, for the detention of its ships at Matanzas. In the first place, it is probable that they were held in that harbor for much shorter periods than were most other vessels which were unfortunate enough to come to Cuban ports at any time within the six months following November 1, 1920. It is true that the respondent's local agent did complain to the libelant's Havana representative that the detention of the ships was costing 'a good deal of money; but it never occurred to the respondent itself that it had any demand until months afterwards, and then it was put forward, apparently as an offset to the libelant's claim for physical damage resulting from careless unloading and stowage.

The respondent, as early as October 1, 1920, had been warned by its Matanzas agent that the harbor was much congested. If it thereafter sent ships there, it necessarily took some risk. It was its business to get the cargo off the ships. It is true that there were some unusual difficulties in the way of getting permission to unload the cars on the custom house wharf; but at that time, if not at every time, it was hard to get official action anywhere, and it was not easier in Cuba than in most other places. Just so soon as the respondent went seriously to work to get the goods on shore, it was able to do so. The consignee could not be required to pay the duties until the cars were landed.

An attempt was made to prove that, by the custom of the port, quedan should have been made and the goods landed on the unofficial wharf. Nevertheless, one of the respondent's Matanzas agents testified that he did not recall any case in which goods ever had been discharged at that wharf until after the duties had been paid. The fact is that it was only for a few months that the respondent had been sending ships to that port. It had not the facilities there possessed by an established competitor, and it speedily encountered the most difficult situation which, in our time at least, has confronted those engaged in the Cuban trade. Nobody knew exactly what to do, and much delay and consequent loss followed. At the time none of those concerned thought of blaming any of the others overmuch. What happened was the natural and almost inevitable result of conditions which suddenly developed themselves in Cuba, and in the creation of which neither the libelant nor the respondent had any share.

[2] There remains for consideration the original complaint of the libelant, namely, that physical damage was done to its cars by the

careless and unskillful way in which they were taken out of the ships and stowed upon the wharf. It is very probable that the people employed by the ships to do the work had had very little experience in handling merchandise of that description. The photographs of the car parts as they were piled on the wharf suggest so much, at least. The limited space available on the custom house wharf might have made it difficult for the most skillful stevedores to have stowed the cargo in the way its owner would like to have had it disposed of. It is not possible now to say how much, if any, substantial damage was the necessary result of what was then done, as distinguished from such injury as resulted from the libelant's allowing the goods to remain unmoved for some seven months. It had been warned at least as early as May that something ought to be done for the protection of its merchandise, but it waited until August to act.

Giving due weight to all the evidence that has been offered on both sides, it is doubtful whether the merchandise in question is not now in substantially as good condition as could reasonably have been expected, after it had been exposed for so long a period to the effects of the Cuban climate. After the goods were unloaded on the wharf, they were at the risk of the libelant. The respondent's responsibility ended. There is evidence that there was much local pilfering of wooden blocks and supports, as well as of the material of the crates. The burden is on the libelant to establish by fairly persuasive evidence what damage was the direct and proximate consequence of what careless unloading there was.

[3] I do not think that this burden was sustained; but, if the fact were otherwise, it would avail nothing. The bills of lading required that suit should be brought within three months after complaint was made. It waited for nearly four. Under the circumstances of this case, there was nothing unreasonable in this requirement. Under the conditions then prevailing in Cuba, it was, it is true, not easy promptly to ascertain what damage had been done; but there was no reason why the libelant should not have sued within three months after it knew enough of its injury to make complaint of it to the respondent. There was nothing in the attitude of the respondent, nor in the letters it wrote on the subject, which waived its right to stand on the letter of its contract. Certainly it did nothing to lull the libelant to sleep.

On the whole case, justice will be done by dismissing both the libel and the cross-libel, and by directing that each party shall pay its own costs.