## AMERICAN STEEL CO. OF CUBA v. TRANSMARINE CORPORATION et al.

District Court, S. D. New York. September 6, 1929.

Hornblower, Miller & Garrison, of New York City (Charles A. Boston, of New York City, of counsel), for libelant.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine, of New York City, of counsel), for respondents.

FRANK J. COLEMAN, District Judge. The principal question presented is whether the carrier is legally responsible for a long delay which occurred in certain deliveries of steel in Havana during the period of intense congestion, 1920–21, which has already been considered by the federal courts. The Poznan (D. C.) 276 F. 418; Transmarine Corp. v. Levitt (C. C. A.) 25 F.(2d) 275; see also Koppel Industrial C. & E. Co. v. Baltimore S. S. Co. (D. C.) 287 F. 203, affirmed (C. C. A.) 299 F. 158. The respondent Transmarine Corporation was the carrier and was a subsidiary of the respondent Submarine Boat Corporation, but it is not important to go into the details of their relationship, because for the purposes of this decision it will be assumed that the two corporations were practically one.

Libelant was a large manufacturer and dealer in steel products in Havana and purchased 10,500 tons of steel from the Consolidated Steel Company in this country under c. i. f. contracts which required that 7,000 tons of the purchase would be placed on board ship not later than June 30, 1920, and the balance before January 1, 1921. The Consolidated Steel Company found difficulty in procuring a carrier for the steel on account of the congestion in the port of Havana, and finally in April, 1920, made an arrangement with the respondent at rates lower than those prevailing, well knowing that the steamship service to Havana was a new enterprise to the respondent and that the latter

had no special facilities there. The arrangement called for delivery by respondent "in accordance with the custom of the port" at libelant's wharf in Havana, which had not sufficient depth of water to permit a steamship to berth, and it was understood that lighterage would be necessary.

It was further understood between the respondent and the Consolidated that the steel was not to be shipped in entire cargoes, but was to form a part of general cargoes carried by respondent's vessels. *No time was specified for delivery*, except that the steel was "to be promptly discharged and delivered" on arrival at Havana, and that the parties "believed" there would be about three sailings a month. The parties both knew the conditions prevailing in that port and must be assumed to have contracted with them in view.

Thereafter the Consolidated forwarded approximately 8,075 tons of steel from its plants in this country to respondent's dock in Port Newark for shipment to libelant in Havana. These deliveries to respondent commenced in June, 1920, and continued until October, 1920. Before the steel was loaded on the boats, respondent issued bills of lading to the Consolidated, which was named as consignee, and the Consolidated, after indorsement, forwarded them with other shipping documents to libelant. Upon the receipt of each bill of lading libelant returned to the Consolidated a trade acceptance for the purchase price of the steel involved, which has since been paid.

The claim for damages for delay in delivery is based upon the time that elapsed between the dates of the various bills of lading and the dates of the deliveries in Havana. These periods varied from 114 to 285 days, and the principal question presented in the case is whether reasonable diligence on respondent's part could have shortened that time. There were 173 bills of lading altogether, and they were dated from June 3, 1920, to October 16, 1920. The deliveries in Havana commenced October 30, 1920, and ended November 4, 1921. The shipments were made by nine steamers which arrived in Havana on various dates from August 18, 1920, to January 6, 1921, and were delayed in unloading for various periods from 33 days to 170 days, calculating from the dates of arrival to the dates of the final deliveries from the respective vessels.

The underlying cause for the delay was the intense congestion in the port of Havana which had commenced before respondent agreed to carry the steel and continued throughout the period under consideration.

Every available warehouse and shelter for goods was filled, with the result that general merchandise could not be unloaded from the vessels. The steel was necessarily placed in the lower parts of the holds of respondent's ships, and consequently could not be unloaded until the rest of the cargo was removed. Furthermore, since Havana had very few piers and wharves at which steamships could dock, it was, generally speaking, a lighterage port; and the congestion exhausted the supply of available lighters. Also, labor conditions were greatly demoralized, and it was extremely difficult to get an adequate supply of stevedores.

Respondent took some special measures to obviate these conditions, which were not specifically required by its agreement with the Consolidated nor by the bills of lading. One of the vessels was loaded entirely with steel at a considerably increased risk to it. To partially overcome the shortage of lighters, respondent purchased seven of them in the United States and sent them to Havana, though there was an unfortunate delay in their utilization due to a variety of causes for which respondent was not at fault. Furthermore, respondent supplied from the United States a stiff-legged derrick for use on libelant's wharf in the unloading of the lighters. It also, late in the period, secured the preferential use of a wharf at a considerable outlay of money. In addition, respondent's officers and managers made trips to Havana to study conditions and to try to devise a solution.

■ Respondent's duty to libelant was founded upon the bills of lading. Though the original agreement between the Consolidated and the respondent called for "prompt" discharge and delivery "in accordance with the custom of the port" and possibly for about three sailings a month, that was not made by the Consolidated as agent for the libelant, and the latter was not a party to it. In fact, it included some steel that was not destined to libelant at all. Furthermore, it was made with full knowledge of the conditions prevailing in Havana and of respondent's facilities, and at lower than the prevailing rates. If it placed an additional burden on respondent, libelant cannot avail itself of it, because the only contractual relations which libelant had with respondent were established by the acceptance of the bills of lading from the Consolidated Steel Company.

■ Libelant contends that there was a deviation which abrogated the bills of lading and deprived respondent of the protection of such special clauses as they contained.⁹ This deviation is predicated upon the delay in discharging at Havana and also a delay in commencing certain of the trips from the United States after the vessels had been loaded. It is undisputed that several of the ships were detained in New York Harbor for weeks and even months after they were loaded because of the fact that they would otherwise have had to spend that period in Havana awaiting discharge, with greater damage to the general merchandise. It is plain that the ultimate delivery of the steel was not deferred one day because of the detention of the boats at New York. The bills of lading provided for such detention, and under all the circumstances I am of the opinion that there was no deviation either because of it or because of the delay in discharge.

■■ Whether the bills of lading remained in full force or not, the extent of respondent's obligation to libelant was to use reasonable efforts to make an early delivery with such facilities as the port of Havana afforded. The shipper knew respondent had no special facilities and there was no term in the contract or in the bills of lading which required the acquisition of them. The special measures which respondent took, as above mentioned, I think were beyond its obligation.

In determining whether respondent used reasonable efforts to effect an early delivery, there are two general considerations which I think are potent. First, the delay was costing the respondent $400 a day for each ship, aggregating hundreds of thousands of dollars. This probably explains respondent's willingness to adopt the measures which lay outside its obligation. It certainly makes it inconceivable that respondent did not do all it knew how to do with the facilities at hand.

The second general consideration is that during the entire period of the deliveries libelant gave no intimation that it intended to look to respondent for damages for delay. There were scores of communications, oral and written, pertaining to the delay, some of them complaining of it, others commending respondent's efforts, but none intimating that respondent was responsible for it so as to become liable for damages. The first time such a claim was made was about 2½ years after the final delivery, in July, 1923, though there had been claims for shortage. This is the more significant, because in 1921 a recovery was sought against the Consolidated Steel Company for the very same items of damage on account of delay which libelant now claims from the carrier.

The Consolidated Steel Company in 1921 brought an action against the Pressed Steel Car Company as guarantor of this libelant's promise to pay the purchase price of the steel, and the defendant interposed a counterclaim based upon an assignment to it of this libelant's claim against the Consolidated for damages arising out of the latter's failure to deliver the steel on time. The Consolidated had agreed with libelant to ship 7,000 tons before July 1, 1920, and by that date only a small part had left its mills. The claim against the Consolidated was practically identical in amount with the one now advanced against the carrier. The action was compromised by the payment to the Consolidated of a sum less than the unpaid balance of the purchase price of the steel. Respondent contends that the compromise is a bar to the present action on the ground that it constituted a payment of libelant's claim for all damages arising out of the delay. While I do not agree with this contention, I think the making of the claim against the Consolidated two years before it was suggested, as against this respondent, is highly significant as to libelant's opinion of respondent's liability.

It would be futile to attempt within the scope of an opinion to narrate or even mention the innumerable incidents relevant to the conditions in Havana and to respondent's efforts to make deliveries. It must suffice to state the conclusions at which I have arrived after a careful study of the briefs and of the evidence. In the first place, I find that libelant was not at fault, and, more specifically, that no material part of the delay was due to congestion either at or on its wharf. On the other hand, I find that respondent did all that could reasonably be expected of it under the conditions prevailing. The testimony of libelant's so-called experts as to what would be a reasonable time for delivery is of no weight because of the nature of the problem and of the witnesses' qualifications. Furthermore, I did not find very enlightening the evidence that in a number of instances regularly established steamship lines owning their own facilities discharged more rapidly than respondent. In fact, all lines were experiencing very unusual delays.

Among the causes for the delay enumerated by libelant's witnesses were respondent's lack of (1) pier or wharf upon which to unload the general cargo; (2) warehouse in which under the Cuban customs regulations it was necessary to store the general cargo; (3) lighters; and (4) mechanical appliances for unloading the lighters. Respondent did procure a limited use of three piers or wharves besides libelant's, and in an effort to increase its facilities in that regard loaned a concern $500,000. It not only purchased and imported 7 lighters, but got the use of 30 at different times. As to appliances for unloading, it supplied a stiff-leg derrick for libelant's work, and some of the lighters used had hoisting apparatus. These measures were of course inadequate, but libelant has not proven to my satisfaction that greater diligence would have disclosed and made available further facilities. Respondent was under no obligation to purchase a pier, build a warehouse, or import lighters. An additional cause for the delay was labor conditions which prevented the prompt unloading of the lighters. Respondent was not responsible for the demoralized condition of labor in Havana, and was under no duty, if indeed it had the power, to import labor from outside. It did, however, at greatly increased expense, frequently employ the stevedores at night, on Sundays, and on holidays, and during the moratorium brought cash from the United States for the pay rolls. Libelant has not convinced me that better results could have been obtained with the available supply of labor by the use of greater diligence on the part of respondent.

There was a complete lack of satisfactory proof that any damages were suffered through the delay that libelant attributed to respondent. Libelant's main reliance was upon special damages arising from loss of business. Such a claim was expressly barred by the bills of lading, but aside from that fact, the circumstances of the shipments precluded respondent's liability for special damages. Its contract was with the Consolidated Steel Company, and special damages to libelant never even impliedly entered into their mutual agreement. It may well be that before the deliveries were made respondent was aware of the possibility of such loss, but it was not contemplated in respondent's contracts. Furthermore, I am not convinced that any loss of business was caused by delay on the part of respondent. Unquestionably libelant lost a large amount of money during that period, but I believe it was due to the moratorium which went into effect October 16, 1920, and to the delay of the Consolidated in delivering to the respondent, rather than to the latter's delay in delivery at Havana.

As to general damages for delay based upon market values of the steel at Havana, I find that there was no recession in price from July 1, 1920, to January 1, 1921, and this is supported by the testimony of libelant's own witnesses. This covered a large part of the

period of deliveries, and as to the remainder the evidence is insufficient to show what, if anything, was the decrease in value between the time when libelant contends the various shipments should have been delivered, and when they were actually delivered.

As to the claim for shortage, libelant proved that the steel which it received and accepted was about 290 tons less than what was called for by the bills of lading. This proof consisted primarily of tally sheets made out at libelant's wharf and signed by respondent's representatives, which showed the amount received from lighters in regular course of unloading. In addition to the steel so received, other deliveries aggregating 90 tons were made by respondent, which the latter contends were not credited to it in arriving at the above shortage of 290 tons. The record is not entirely satisfactory upon that point, but I believe that the credit was duly given and that the discrepancy between the bills of lading and the deliveries was as stated.

Respondent, however, made a tender of two lighterloads of steel in October, 1921, which libelant refused to receive on the ground of its alleged deteriorated condition and also because of the lateness of the tender. I find that the steel in question was included in the bills of lading, and that the circumstances did not justify libelant's rejection of it. There was no deviation, and even if libelant had a claim for deterioration or for delay, its rejection could not form the basis for a claim for shortage.

There is a dispute as to whether the amount of steel tendered was one lighterload or two, but I believe the greater weight of the evidence is in favor of a finding that it was two, and that it aggregated about 200 or 250 tons. Crediting respondent with this amount would still leave a small shortage which ought to be paid for. Instead of appointing a special commissioner to assess the damages, I would suggest that counsel, by stipulation or otherwise, assist me to determine the amount of it in accordance with the above findings, reserving, of course, their rights on appeal.

There is only one further point to be mentioned. The bills of lading contained a clause requiring that notice of all claims, which I construe to include claims for both delay and shortage, be made in writing within three days after the steamer completed its discharge. Libelant's failure to comply with that clause was excusable under the circumstances of this case, and constitutes no bar to its claim for either delay or shortage, though it has some evidentiary value in connection with the claim for delay.