## THE PLOW CITY.
### No. 65 of 1937.
*v*

District Court, E. D. Pennsylvania.
May 26, 1938.

carloads of pipe to be transported and delivered to itself at the Port of Houston, Texas. On the same day the master of the vessel gave the libellant a receipt for the cargo and on November 4, 1936 the agents of the owners of the vessel issued a bill of lading covering the shipment. The bill of lading contained the following clauses, inter alia:

"Neither the vessel, her owner, nor agent shall be liable for loss or damage resulting from: Act of God; perils, dangers, and accidents of the sea or other navigable waters; fire, from any cause or whereso- ever occurring; barratry of master of crew; enemies, pirates, or robbers; arrest or restraint of princes, rulers, or people, or seizure under legal process; fumigation un- der governmental orders; riots, strikes, lockouts, or stoppage of labor; saving or attempting to save life or property at sea; inherent vice, natures defect, or change of character of the goods; insufficiency or absence of marks, numbers, address, de- scription or insufficiency of packages; ex- plosion, bursting of boilers, breakage of shafts, or any latent defects in hull, ma- chinery, or appurtenances, or unseaworthi- ness of the vessel, whether existing at the time of shipment or at the beginning of the voyage, provided the owners shall have exercised due diligence to make the vessel seaworthy, properly manned, equipped, and supplied * * *

"If the owners shall have exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied, it is hereby agreed that in case of danger, damage or disaster result- ing from faults or errors in navigation, or in the management of the vessel, or from any latent or other defects in the vessel or machinery or appurtenances, or from un- seaworthiness, whether existing at the time of shipment or at the beginning of the voyage, owners shall not be liable there- for and the shippers, consignees, and/or owners of the cargo shall nevertheless pay salvage and any special charges incurred in respect of the cargo, and shall contribute with the shipowner in general average to the payment of any sacrifices, losses, or ex- penses of a general average nature that may be made or incurred for the common benefit or to relieve the adventure from any common peril.

* * * * * * * * * *

"Notice of loss, damage, or delay must be given in writing to the vessel's agent

Lewis, Wolff & Gourlay, by Otto Wolff, Jr., and John Hemphill, all of Philadelphia, Pa., for libelant.

Conlen, LaBrum & Beechwood, by George E. Beechwood, and James S. Benn, Jr., all of Philadelphia, Pa., for respondent.

MARIS, District Judge.

This is a suit in admiralty against the Steamship Plow City in rem for damages. The Plow City Steamship Company ap- peared as claimant of the vessel. From the evidence I make the following special find- ings of fact:

Pursuant to an oral arrangement be- tween the libellant and the agents for the owner of the Plow City, confirmed by let- ter to the libellant dated October 10, 1936, the libellant on October 31, 1936 shipped and placed on board the vessel, then lying at the port of Chester, Pennsylvania, 40

within thirty (30) days after the removal of the goods from the custody of the vessel, or, in case of failure to make delivery within thirty (30) days after the goods should have been delivered: Provided That notice of apparent loss or damage must be given before the goods are removed from the custody of the vessel, and proper notation made on receipt given to the vessel for the goods shall constitute the notice herein required, written claim for loss, damage, or delay must be filed with the vessel's agent within (3) months after giving such written notice. Unless notice is given and claim filed as above provided, neither the vessel, her owner nor agent shall be liable. No suit to recover for loss, damage, delay, or failure to make delivery shall be maintained unless instituted within one year after the receipt of the goods by the carrier."

The Plow City was somewhat delayed by a strike but on November 14th she sailed. Prior to sailing the libellant did not inform the master of the vessel or its owner that it was in any urgent need of prompt delivery of the pipe or that the pipe was to be put to any special use.

At the commencement of the voyage the Plow City was seaworthy, both with respect to her hull and with respect to the loading and stowage of her cargo of pipe.

On the second, third and fourth days of the voyage the Plow City encountered heavy weather which caused her to roll considerably. On the second day while rolling heavily the lashings of the pipe in the No. 2 cargo hold gave way and the pipe shifted to port giving the ship a heavy port list. The next day the loose pipe was secured and the ship straightened by pumping water into the starboard No. 2 deep tank. On the morning of the third day of the voyage water was discovered on the port side of the bottom of No. 4 cargo hold and was pumped out. The same condition was encountered the next day. This leak was caused by a small hole in a worn section of the shell plating under the No. 4 cofferdam and by a number of loose rivets. Both the hole in the plate and the loosening of the rivets were the result of the heavy weather which the vessel had encountered.

During this heavy weather the rolling of the vessel constantly caused the intake for her main circulating pump to come out of water whereby the pump lost suction, causing it to race heavily. On the evening of the second day of the voyage the third assistant engineer, who was a new man on the ship, by mistake shut off an exhaust valve from the lubricating oil pump, which caused the pump to stop. This in turn reduced the pressure of oil lubricating the main circulating pump. This combined with the constant racing of the latter resulted on the next day in the casing of the turbine of the main circulating pump bursting. This pump supplied cold water to the main condenser and when it burst it was necessary to substitute the ballast pump for circulating water in the condenser.

After the circulating pump blew out the master conferred with the other officers and decided to put in toward Charleston for repairs. This decision was based solely upon the necessity of repairing the circulating pump. The leak in No. 4 cargo hold was not considered serious by the officers and was not a factor which entered into the determination. Using the ballast pump as a circulator the vessel was able to reach Savannah where she docked on November 18th.

When the Plow City reached Savannah her owner and libellant were at once notified of the situation. Harry Graham, the owner's marine superintendent, who had shipped on board as a seaman in order to complete the crew, immediately proceeded to make inquiries as to the parts needed to repair the circulating pump and ascertained that it would take eight weeks to get these parts from the manufacturer. He then went north to look for a secondhand pump and a few days later in Baltimore purchased one which was shipped to Savannah. The steam end of this pump was fitted into the water end of the circulating pump on the Plow City and the latter was thus repaired. These repairs were completed by December 10th.

As soon as they learned that the Plow City had put into Savannah for repairs John C. Rogers, president of the owner, and Paul J. Carey, traffic manager of the libellant, got into cummunication with each other. Carey then for the first time informed Rogers that libellant urgently needed the cargo of pipe to replenish its stock at Houston which had been greatly reduced by sales. Since at that time it appeared that the Plow City might be delayed at Savannah for at least eight weeks he requested Rogers to ascertain whether another vessel was available to carry the cargo on to Houston. In response to this re-

quest Rogers whose company was agent for the owner of the steamship Suwied obtained leeway from the charterers of that steamship and ordered her to steam toward Savannah.

Rogers and Carey then went to Savannah, arriving on the evening of November 21st. Thereupon a conference was held, attended by Rogers, Carey, Graham, surveyors for the London Salvage Association and the American Bureau of Shipping and one of the steamboat inspectors. The situation was reviewed at this conference and the proposition of towing the Plow City to Houston in her then condition was discussed and decided against. The suggestion of transporting the cargo by rail was also made and rejected. It was finally agreed by everyone that the cheapest way out of the situation was to make use of the Suwied. It was made clear by Rogers to Carey that the libellant was under no obligation to accept the Suwied and that if used her charges for the transportation of the pipe would have to be paid. He stated that the Plow City was bound for Texas in any event and was quite prepared to resume her voyage as soon as repairs were completed.

Carey thereupon determined, on behalf of the libellant, to send on three carloads of the pipe by rail and to transship the balance by the Suwied and he agreed to pay the charges of the Suwied for the shipment. Thereafter the Suwied arrived at Savannah and all of the remaining cargo on the Plow City, except 19 pieces, was transferred to her. She then proceeded to Galveston, whence the cargo was transported by rail to Houston. On November 30th libellant paid the Suwied Steamship Company the agreed freight amounting to $7,809.02. The libellant also paid stevedoring charges at Galveston amounting to $817.00, railroad freight on the pipe from Galveston to Houston amounting to $2,124.75, and certain other expenses amounting to $493.44, all of which it contends were required as a result of the delay in the voyage of the Plow City.

After the cargo had been transshipped and after the repairs had been made to the circulating pump at Savannah the owner of the Plow City decided to send her to Jacksonville where there were dry dock facilities in order that such repairs might be made to her hull as might be necessary to stop the leak which had appeared in the cofferdam under the No. 4 cargo hold. She accordingly left Savannah on December 10th and arrived the next day at Jacksonville where she was dry docked and examined. It was then found necessary to weld a patch on the shell plating under the bottom of the cofferdam under No. 4 cargo hold and to renew approximately 75 rivets. At the same time while she was in dry dock certain other repairs to the hull and other parts of the vessel were also made. These were completed on December 31st, on which day the vessel left Jacksonville to complete her voyage to Galveston which she reached on January 5, 1937, where the remaining 19 pieces of her cargo of pipe were discharged. The value of the pipe shipped was on that date no less and probably more than its value on November 14, 1936, when the voyage began.

On November 20, 1936, the libellant executed an average agreement under which Hutchinson, Rivinus & Co. were appointed to state an average adjustment in case it should be found that the vessel was on general average. Before agreeing to the use of the Suwied, Carey procured an agreement by all parties in interest and their underwriters that the expenses of forwarding the cargo from Savannah to Houston should be treated as substituted expenses in general average, if it should be determined that the vessel was on general average. Thereafter an adjustment of general average was stated by Hutchinson, Rivinus & Co., as average adjusters. Pursuant to that adjustment as revised, which showed a net balance due the cargo by the hull, the average adjusters tendered to the libellant the sum of $2,864.13. This sum was thereafter returned by the libellant to the average adjusters to be held in trust for it pending the outcome of the present suit.

## Discussion

This suit has been brought to recover from the Steamship Plow City the expenses of transshipping her cargo of pipe from Savannah to Houston, the libellant having paid in advance the freight due the Plow City for the transportation of the cargo. The libellant advances two theories upon which it claims to be entitled to recover. The first is that the owner of the Plow City was guilty of negligence in tendering a vessel which was unseaworthy, that the vessel was obligated to make delivery of the pipe at Houston within a reasonable time and that, since the voyage was delayed by reason of the owner's negligence, it was

its duty to transship the pipe at its own expense. Having failed to do so the libellant claims to be entitled to recover the cost of such transshipment which it paid.

■■ The answer to this contention is that the claimant was not guilty of negligence in tendering an unseaworthy vessel for the reason that the Plow City was in fact seaworthy, as I have found. Furthermore the principal basis for the claim of unseaworthiness, the leak in the cofferdam under the No. 4 cargo hold, was not the reason for the vessel putting into Savannah and, therefore, was in no sense a contributing cause of the delay of which the libellant complains. Consequently the latter condition, even if it had existed at the beginning of the voyage, which I have found it did not, would not support the libellant's claim in this case. May v. Hamburg, etc., Aktiengesellschaft, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348.

■■ Nor was the delay due to any other negligence on the part of the owner of the vessel. I have found as a fact that the breakdown of the main circulating pump, which was the sole reason for putting into Savannah for repairs, was due to the strain placed upon it by the heavy weather encountered by the vessel and the faulty operation of an oil pump by the third assistant engineer. The bill of lading provided that "If the owners shall have exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied, it is hereby agreed that in case of danger, damage, or disaster resulting from faults or errors in navigation or in the management of the vessel, * * * owners shall not be liable therefor * * * ." This provision is in conformity with section 3 of the Harter Act (46 U.S.C. § 192, 46 U.S.C.A. § 192). There is no contention that the owner failed to exercise due diligence to properly man, equip and supply the vessel. It follows that the present suit cannot be sustained upon the theory of negligence on the part of the owner.

The libellant urges, however, as an alternative theory of recovery, that even though the vessel was seaworthy and her owner free from negligence the master of the vessel was still obligated to forward the cargo if repairs to the vessel could not be completed within a reasonable time. In that event it is contended the vessel would be responsible to pay the forwarding charges up to $7,809.02, the amount of freight

which it had received in advance from the libellant, and could only charge the cargo with the excess of the transshipment charges over that amount. The libellant accordingly contends that since, as it alleges, the repairs did delay the Plow City an unreasonable length of time and since the master of the vessel failed to forward the cargo, it, having done so at an expense of more than $7,809.02, is entitled in any event to recover that amount in this suit.

■■ It is undoubtedly the duty of the master of a vessel which is disabled in the course of the voyage and compelled to seek a port of refuge for repairs, to transship the cargo by another vessel if it·is available and if the repairs cannot be completed within a reasonable time, The Maggie Hammond, 9 Wall. 435, 19 L.Ed. 772, and in that event if his freight has been paid in advance he is entitled to charge the cargo with the excess, if any, of the freight payable to the forwarding vessel over the freight already received by him. Hugg, Adm'r, v. Baltimore & Cuba Smelting & Mining Co., 35 Md. 414, 6 Am.Rep. 425. However, when a ship becomes unfit for navigation from a cause which does not involve a breach of duty on the part of the carrier and it is necessary to interrupt the voyage for the purpose of repairs the master may detain the cargo until such repairs shall have been effected, if it is possible to complete them within a reasonable time. The Strathdon, D.C., 89 F. 374.

■ If the ship does detain the cargo while repairs are being made and the completion of the repairs results in an unreasonable delay of the voyage, the vessel will be liable to the shipper for damages resulting from the decrease in the value of the cargo, during the period of delay, if the vessel was unseaworthy when the voyage began. The Caledonia, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644; The Malcolm Baxter, Jr., 277 U.S. 323, 48 S.Ct. 516, 72 L.Ed. 901. This would probably also be so even if the vessel was seaworthy and the delay was due to an accident of the sea or mismanagement for which the owner was not responsible under the Harter Act, 46 U.S.C.A. § 190 et seq. I need not determine this, however, since in this case the libellant itself voluntarily arranged for and carried through the transshipment of the cargo. It did this because of its own urgent need for the pipe, which special need had not been communicated to the owner or master of the vessel before the voyage began.

The evidence was uncontradicted that the cargo did not decrease in value during the delay but on the contrary had actually increased at the time when the Plow City completed her voyage. The delay, therefore, did not result in damage to the libellant for which the vessel would be liable under the rule above stated. The Caledonia, supra. The transshipment charges voluntarily paid by the libellant were in the nature of special damages for which the Plow City was not responsible in the absence of a special agreement, Earn Line S. S. Co. v. Manati Sugar Co., 2 Cir., 269 F. 774; American Steel Co. of Cuba v. Transmarine Corporation, D.C., 36 F.2d 246, or unless advance notice had been given of the special urgency of delivery by reason of the special use to which the cargo was to be put. United States Shipping Board E. F. Corp. v. Florida G. & E. Co., 5 Cir., 20 F.2d 583.

Furthermore I am not prepared to say that the delay of twenty-two days in Savannah and twenty days in Jacksonville did amount to an unreasonable delay which would have made it the duty of the master to transship the goods. As I have indicated, this question need not be decided, however, since the libellant voluntarily for reasons deemed by it sufficient took delivery of the goods at Savannah and forwarded them to their destination at its own expense. In my opinion the libellant's voluntary action in so doing bars it from recovering from the vessel the amount expended for the transshipment especially in the absence of evidence that the cargo would have depreciated in value if it had remained on the Plow City and had not been delivered until January 5th, when she reached Galveston. What has already been said makes it unnecessary to consider the owner's contention that the libellant failed to give notice of its damage and make claim therefor in the manner and within the time stipulated in the bill of lading.

Since the interruption of the voyage of the Plow City was not caused by the unseaworthiness of the vessel or the negligence of her owner the losses resulting from the accident to the circulating pump and the consequent delay of the voyage were the proper subject of general average. Before the libellant engaged the Suwied to transship the cargo it was agreed by all the parties involved that in that event the transshipment charges should be considered as substituted charges in general average. Average adjusters appointed by the parties have stated a balance of $2,864.13 in favor of the cargo and on December 4, 1937 that sum was tendered to the libellant. It was, however, returned by the libellant to the average adjusters to be held in trust for it pending the outcome of this suit.

The contention of the libellant is that more than $2,864.13 is due it in general average and it, therefore, asks, as a third alternative, for a decree in its favor for the amount due it upon a proper general average adjustment. It may have such a decree in this suit. Dupont de Nemours & Co. v. Vance et al., 19 How. 162, 15 L. Ed. 584. The decree, however, should provide that the costs of suit shall be borne by the libellant unless the amount finally awarded to it is greater than the amount heretofore tendered with interest.

I accordingly reach the following conclusions of law:

The libellant is not entitled to recover from the Plow City its expenses incurred in transshipping its cargo of pipe from Savannah to Houston nor is it entitled to recover from the Plow City the amount of the freight paid it in advance.

The libellant is entitled to claim as substituted charges in general average the transshipment charges incurred by it and is entitled to a decree in its favor for the balance, if any, found to be due it in general average.

The cause should be referred to a commissioner to determine the amount, if any, due the libellant in general average.

A decree may be entered accordingly.