## MAY ET AL. v. HAMBURG-AMERIKANISCHE PACKETFAHRT AKTIENGESELLSCHAFT.

No. 80. Argued November 14, 15, 1933.—Decided December 4, 1933.

334

*Mr. D. Roger Englar,* with whom *Messrs. T. Catesby Jones* and *Henry N. Longley* were on the brief, for petitioners.

*Mr. John W. Griffin,* with whom *Mr. Charles S. Haight* was on the brief, for respondent.

336

338

MR. JUSTICE CARDOZO delivered the opinion of the Court.

The assignee of cargo owners filed libels against the respondent, the owner of the "Isis," to recover moneys deposited as security for general average contributions, the deposit being exacted by the respondent as a condition of delivery.

The Isis, a vessel of about 7,000 tons, sailed from loading ports on the Pacific coast with cargo destined for Bremen, Hamburg and Antwerp. She was then seaworthy in hull and gear, and fitted in all respects for the intended voyage. In the Weser River, not far from Bremen, Germany, her first port of discharge, she stranded by reason of negligent

navigation, with damage to her rudder stock and also to the rudder blade. Aided by tugs she continued up the river to Bremen, disclosing as she moved a tendency to sheer to starboard. On arrival at that port, she discharged her Bremen cargo, and there was then an inspection of the damage. The rudder stock had been twisted about 45 degrees. To ascertain the condition of the blade, the vessel was put in a drydock and kept there a few hours. The examiners reported that the blade was intact. In fact the lower part of it was bent to starboard to the extent of about five degrees. The inspection was after dark with the bottom of the rudder still under water. The two courts below have concurred in a finding that the use of reasonable care would have caused the bend to be discovered.

The head office of the owner, at Hamburg, was notified of the mishap to the vessel before she landed at Bremen, and the marine superintendent was sent to meet her. The superintendent, Reichenbacher, and the master of the vessel, Krueger, consulted, along with others, as to what ought to be done. Bremen had adequate facilities for the making of complete repairs, but it would have taken about two weeks to make them. To save time and expense to the vessel and her cargo, the decision was made to send her to Hamburg, about seventy miles away, the cargo still aboard. Before a start was made, the rudder was lashed amidships so as to be incapable of motion. The vessel then set forth in the towage of three tugs, one of them in front, and one on either side. No harm befell for a distance of about six miles. Then, at or near the junction of the Weser and Lesum Rivers, the pilot in control changed her course to starboard in order to pass a vessel coming up. There is a finding that her navigation at this point was unskilful and negligent in that she was driven at too high a speed and too close to the edge of the channel. At all events, in passing she made a sheer to star-

board which the tugs and her engines were unable to control. She was stranded hard and fast amidships on a sand spit near the bank.

With the aid of tugs and lighters the vessel and the cargo were brought back to Bremen, where the new damage was repaired. It was in the course of these repairs that the bend in the rudder was observed.[1] In the meantime the entire cargo was transshipped to Antwerp. Before delivery at destination, the respondent made demand of the consignees that they deposit sums of cash as security for the payment of general average contributions to the sacrifices and expenses due to the two strandings. The bills of lading contain what is known as the Jason clause (*The Jason,* 225 U.S. 32, 49) whereby the consignees agree that if the shipowner has used due diligence to make the ship seaworthy, the cargo is to be liable in general average when the sacrifice or expense results from negligent navigation. The form of the clause applicable to nearly all the shipments is stated in the margin.[2] For a small part of the shipments the form is slightly different, but no point is made that there is any difference of meaning.

---

[1] We have assumed for present purposes that the bend was the result of the first stranding, and not the second. This is in accordance, it seems, with the opinion of the Court of Appeals. The Commissioner who heard the witnesses, found that the evidence was too evenly balanced to enable him to make a finding either way. Since the burden of proof was on the respondent to make out its claim for exemption, the effect is the same as if the finding were against it. The Commissioner did find that the bend, if it existed, could have been discovered by the exercise of reasonable care.

[2] General Average shall be payable in accordance with York-Antwerp Rules 1890 and at carrier's option as to matters not therein provided for in accordance with the laws and customs of the port of New York. All General Average statements shall be prepared at the vessel's final port of discharge or elsewhere at the carrier's option. If the carrier shall have exercised due diligence to make the vessel in all respects seaworthy and to have her properly manned, equipped and supplied, it is hereby agreed that in case of danger, damage or disaster resulting

Under these clauses the consignees do not dispute the liability of the cargo for general average contributions in respect of the first stranding. They do dispute the liability in respect of the second. To recover their deposits to the amount of that excess, they transferred their claims to an assignee by whom five libels, afterwards consolidated, were filed against the owner. The District Court, confirming the report of a commissioner, gave judgment for the defendant, 57 F. (2d) 265. The Court of Appeals for the Second Circuit affirmed, 63 F. (2d) 248, though in so doing it did not agree with all the findings below. The libellant, May, joined the stipulators for costs (Indemnity Insurance Company of North America and Royal Indemnity Company) in a petition to review the decree of affirmance. A writ of certiorari brings the case here.

1. The first question to be determined is whether the cargo must contribute to the sacrifices and expenses resulting from the second stranding if there was a negligent failure by the shipowner to make the ship seaworthy when she left her dock at Bremen.

Until the enactment of the Harter Act (Feb. 13, 1893, c. 105, § 3, 27 Stat. 445; 46 U.S.C., § 192) a shipowner was not at liberty by any contract with the shipper to rid himself of liability to the owners of the cargo for damages resulting from the negligence of the master or the crew. *Liverpool & G. W. Steam Co. v. Phenix Insurance Co.,*

---

from fault or error in navigation or in the management of the vessel, or from any latent or other defect in the vessel, or machinery, or appurtenances, or from unseaworthiness, although existing at the time of shipment or at the beginning of the voyage (provided the defect or unseaworthiness was not discoverable by the exercise of due diligence), the shippers, consignees, or owners of the cargo shall nevertheless pay salvage and any special charges incurred in respect to the cargo, and shall contribute with the carrier in General Average to the payment of any sacrifices, losses, or expenses of a General Average nature that may be made or incurred for the common benefit or to relieve the adventure from any common peril.

129 U.S. 397, 438; *The Delaware,* 161 U.S. 459, 471; *The Jason, supra,* p. 49; *The Willdomino,* 300 Fed. 5, 9. Section 3 of the Harter Act[3] was the grant of a new immunity. Neither the vessel nor her owner was to be liable thereafter for damage or loss resulting from faults or errors in navigation or in management, if the owner had complied with a prescribed condition. The condition was that he must have exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped and supplied. If that condition was not fulfilled, there was liability for negligence in accordance with the ancient rule. Release from liability for negligence when effected by the act did not mean, however, that an obligation was laid upon the cargo to contribute to general average. *The Irrawaddy,* 171 U.S. 187. To create that obligation there was need of an agreement. For a time there was doubt whether such an agreement, if made, would be consistent with public policy. The doubt was dispelled by the decision in *The Jason, supra.* "In our opinion, so far as the Harter Act has relieved the shipowner from responsibility for the negligence of his master and crew, it is no longer against the policy of the law for

---

[3] " Limitation of liability for errors of navigation, dangers of the sea and acts of God. If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

him to contract with the cargo-owners for a participation in general average contribution growing out of such negligence; and since the clause contained in the bills of lading of the *Jason's* cargo admits the shipowner to share in the general average only under circumstances where by the act he is relieved from responsibility, the provision in question is valid, and entitles him to contribution under the circumstances stated." *Ibid.,* p. 55.

The Isis being seaworthy when she broke ground in the Pacific the cargo was under a duty to contribute to the expenses of the first stranding, which occurred as the result of faulty navigation before the arrival of the ship at Bremen. Neither here nor in the courts below has there been any contention to the contrary. Whether a like duty existed in respect of the expenses of the second stranding is not so easily determined. The only negligence for which immunity is given by § 3 of the Harter Act is negligence in the navigation or management of the ship. *The Carib Prince,* 170 U.S. 655, 661, 662; *International Navigation Co.* v. *Farr & Bailey Mfg. Co.,* 181 U.S. 218. If the master of the Isis had acted on his own responsibility at Bremen in sending the vessel on, the fault would have been negligence in management, or so we may assume. But that is not what happened. The owner intervened by its marine superintendent, who was sent from Hamburg to Bremen to inspect the disabled vessel and determine what to do. He consulted with the master and others. The decision in the end was his. This he tells us very frankly. If reasonable diligence would have shown that the vessel was unseaworthy when he sent her on her way, there was something more than an error in navigation or management on the part of master or of crew. There was a failure by an owner to fulfill the condition on which immunity depended.

We do not forget that seaworthiness is determined for many purposes according to the state of things existing at

the beginning of the voyage. This is true of a warranty of seaworthiness in charter parties or in contracts of affreightment. *The Edwin I. Morrison,* 153 U.S. 199, 210; *The Caledonia,* 43 Fed. 681, 685; 157 U.S. 124, 130; *Earle & Stoddart* v. *Wilson Line,* 287 U.S. 420, 426; *McFadden* v. *Blue Star Line,* [1905] 1 K.B. 697, 703. It is true of the like warranty in contracts of marine insurance. *Union Ins. Co.* v, *Smith,* 124 U.S. 405, 427; *Smith* v. *Northwestern Fire & Marine Ins. Co.,* 246 N.Y. 349, 359, 363, 364; 159 N.E. 87. But the provisions of the Harter Act relieving an owner from liability to the cargo for errors of management or navigation do not charge him with a warranty. What they say to him is this, that if he wishes the immunity he may have it, but only upon terms. He must do what in him lies by the exertion of due diligence to make the vessel safe and sound. If the management of the ship is in the hands of master and crew, he will be relieved of liability for supervening losses, provided only that his own duty has been fulfilled at the beginning. If the term of management is over and the ship is in his hands again, the duty is renewed.

The question then is when management begins and ends. Iron shutters are left open through the negligence of the crew while the ship is in a heavy sea. Liability for the damage will not be chargeable to the owner, for this is a fault of management. *The Silvia,* 171 U.S. 462. Upon arrival at a port of call, the master is negligent in his inspection of the ship or its equipment. Liability for the damage will not be chargeable to the owner, for this again is a fault of management. *The Steel Navigator,* 23 F. (2d) 590; *The Milwaukee Bridge,* 26 F. (2d) 327, 330; *United States* v. *N. Y. & O. S.S. Co.,* 216 Fed. 61, 71; *Jay Wai Nam* v. *Anglo-American Oil Co.,* 202 Fed. 822; *The Guadeloupe,* 92 Fed. 670. Cf. Carver on Carriage by Sea, 7th ed., § 103e, collating the decisions. Arrived at destination, the engineer omits to close a valve with resulting

damage to the cargo. Once more, liability for the damage will not be chargeable to the owner, for this again is management. *The Wildcroft,* 201 U.S. 378. One has only to sketch these situations in order to perceive the gap dividing them from that before us here. Here is a case where master and crew have surrendered their management and have made appeal to the owner to resume control himself. Response to that appeal destroys the continuity of the voyage, as if it were broken into stages. Cf. Arnould, Marine Insurance, 11th ed., vol. 2, §§ 699, 700, 701; *Greenock S.S. Co.* v. *Maritime Ins. Co.,* [1903] 2 K.B. 657. An owner intervening in such circumstances must be diligent in inspection or forfeit his immunity. Negligence at such a time is not the fault of servants employed to take the owner's place for the period of a voyage. It is the fault of the owner personally, exercising his own judgment to determine whether the voyage shall go on. *The Waalhaven,* 36 F. (2d) 706, 709.

2. Due diligence being necessary to make the ship seaworthy at Bremen as well as at the Pacific ports, the second question to be determined is whether due diligence was used.

The District Court and the Commissioner found that the Isis, though crippled when she left the dock at Bremen, was seaworthy with the aid of tugs for the voyage then before her. Seaworthiness, it is well known, is a relative term. *The Sagamore,* 300 Fed. 701, 704; Carver, Carriage by Sea, 7th ed., § 18 and cases cited; Arnould, Marine Insurance, 11th ed., § 710. The Court of Appeals held the view, according to our reading of the opinion, that the vessel with her rudder disabled and defective was not so fitted for her voyage as to cast upon the cargo the risk of faults of navigation.

The respondent, claiming the benefit of a conditional exemption, has the burden of proof that the condition was fulfilled. *The Southwark,* 191 U.S. 1, 12; *The Wildcroft,*

*supra,* at p. 386. We are unwilling to say in opposition to the finding of the Court of Appeals that the burden has been borne. The fact is undisputed that the rudder, being disabled, was useless as an instrument to control the movement of the vessel. There is evidence that in addition to being useless it was positively harmful by reason of a bend to starboard. These two defects together defeat the carrier's endeavor to shift the risk upon the cargo.

The respondent insists that a vessel may be seaworthy though she is navigated by tugs. No doubt that is true where the rudder is capable of use. This is far from saying that the risk to the cargo is not appreciably increased if the rudder is out of commission and so incapable of giving aid when an emergency arises. There is no need to go beyond the pages of this record for proof that this is so. Witnesses for the respondent tell us that a vessel with the rudder lashed may be towed without risk if the speed of the tugs is slow, less than seven kilometers an hour. They admit that the useless rudder becomes a source of danger if the speed of the tugs is higher, seven kilometers or more. We turn to the findings of the Commissioner approved by the District Court. From these it appears that the Isis was proceeding, when she sighted the upbound steamer, at a speed of more than eight kilometers an hour. Not only that, but the Commissioner has found that she was navigated at too high a speed and too close to the edge of the channel, and that because of these errors she stranded a second time. The speed and the place would in all likelihood have been harmless if she had been navigating the river with her steering gear in order. The carrier sent her forward with her steering gear crippled when there was opportunity to make it sound. No doubt there are occasions when owner and master are left without a choice. The vessel may be disabled at a place where the making of repairs is impossible or unreasonably difficult.

In such circumstances she must go her way with such help as can be gathered. Here no emergency was present to excuse the decision that was made. The carrier would have had no difficulty in making the repairs at Bremen. The risks of navigation that are cast by statute upon the owners of the cargo are those that remain after the carrier has done his duty. They do not include risks that would have been avoided or diminished if the vessel had gone out with her equipment staunch and sound. A carrier who chooses for his own purposes to send out a crippled ship with needless enlargement of the perils of navigation will not receive exemption at the cost of the owners of the cargo if the perils thus enlarged have brought the ship upon the sands. "When the owner accepts cargo in an unseaworthy ship, though the defect be such as may be neutralized by care, he imposes on the shipper an added risk; not merely that his servants may fail, in so far as she is sound and fit, but that they may neglect those added precautions which her condition demands. That risk the statute does not impose upon the shipper; he bears no loss until the owner has done his best to remove all risks except those inevitable upon the seas." Learned Hand, J., in *The Elkton,* 49 F. (2d) 700, 701.

The rudder, however, was not merely useless and disabled. By reason of the bend of five degrees, it was positively harmful at least to some extent. Reichenbacher, the marine superintendent, stated in his testimony that he would never have let the vessel leave the dock at Bremen if he had known of the bend. Krueger, the master, testified to the same effect. The Commissioner put aside these admissions with the remark that the witnesses "overdid an effort to establish a character for caution." He preferred to accept the testimony of Captain Davis, a tried and efficient wreckmaster in the Harbor of New York, who testified as an expert without personal experience of the navigation of the Weser. Captain Davis

stated that a bend of fifteen degrees would surely have been dangerous, that there would probably have been danger in a bend of ten degrees, but that a bend of five degrees would not prevent the ship from being under command, particularly if the ship was going at a low speed. At the same time he admitted that even a five degree bend would affect the ship to some extent, and that it would be very important and valuable to know of its existence. Such testimony is far from convincing in the face of the admissions of the superintendent and the master who had every motive to present the case in the way most helpful to the owner. The argument is pressed that if the bend of five degrees had a tendency to sheer the ship to starboard, the movement should have been felt during the six miles traveled before the second stranding. We follow the courts below in their finding that the sheering was not observed, though there is evidence to the contrary. Even so, the movement may have been so counteracted by the engines of the vessel and the tugs that little heed was given it. In any event the significant fact remains that there is no finding by any court that the bend in the rudder did not affect the steering of the Isis at the moment of the stranding. The Commissioner found that the vessel did not have any " marked tendency to sheer," and that if such a tendency existed, the power of her engines and the tugs was adequate to correct it. The Circuit Court of Appeals held that the bend would not affect the steering " except to a slight extent."

We think the cumulative effect of the evidence that the rudder was disabled and that there was a bend of five degrees is to exact of us a holding that the respondent has failed to sustain the burden of establishing due diligence in making the ship seaworthy for her voyage down the Weser.

3. If due diligence was not used in creating a seaworthy condition, the third question to be determined is the need

of a causal relation between the defect and the ensuing loss.

The District Court and the Court of Appeals, though at odds with each other as to the seaworthy condition of the vessel when it left the dock at Bremen, are at one in finding that the cause of the stranding was faulty navigation. Cf. *Orient Ins. Co.* v. *Adams*, 123 U.S. 67, 72; *Queen Ins. Co.* v. *Globe Ins. Co.*, 263 U.S. 487, 492; *The Manitoba*, 104 Fed. 145, 154, 155.

Whether a shipowner who negligently omits to make his vessel seaworthy may have the benefit, none the less, of § 3 of the Harter Act if there is no causal relation between the defect and the disaster is a question as to which the circuit courts of appeals in different circuits, and even at times in the same circuit, are divided into opposing camps, though the discord in many instances is the outcome of dicta rather than decisions.

Favoring the view that the benefit of the act is lost without reference to any causal relation between the defect and the disaster are *The Elkton, supra,* p. 701 (Second Circuit); *Louis Dreyfus & Co.* v. *Paterson Steamships, Ltd.,* 67 F. (2d) 331 (Second Circuit); *The Willdomino,* 300 Fed. 5, 10, 11 (Third Circuit), affirmed on other grounds in 272 U.S. 718; *The R. P. Fitzgerald,* 212 Fed. 678 (Sixth Circuit); also the following decisions of District Courts: *The River Meander,* 209 Fed. 931, 937; *Merklen* v. *Johnson & Higgins,* 3 F.Supp. 897; *The Indien,* 1933 American Maritime Cases, 1342. Favoring the other view are *The Spartan (Hartford & N. Y. Transportation Co.* v. *Rogers & Hubbard Co.),* 47 F. (2d) 189, 192 (Second Circuit); *Rosenberg Bros. & Co.* v. *Atlantic Transport Co.,* 25 F. (2d) 739 (D.C.Cal.); and cf. *The Turret Crown,* 284 Fed. 439, 444, 445 (Fourth Circuit); *The Thessaloniki,* 267 Fed. 67, 70 (Second Circuit).

We think the rulings and dicta of the cases in the first group are supported by the better reasons.

The statute, aided by the contract, gives the shipowner a privilege upon his compliance with a condition. If he would have the benefit of the privilege, he must take it with the attendant burden. There would be no end to complications and embarrassments if the courts were to embark upon an inquiry as to the tendency of an unseaworthy defect to aggravate the risk of careless navigation. Little can be added on this point to what has been said so well by Learned Hand, J., in a case already cited. *The Elkton, supra.* The barrier of the statute would be sufficient, if it stood alone, to overcome the claim of privilege. It is reinforced, however, by the barrier of contract. The Harter Act, as we have seen, would not impose upon the cargo a duty to share in general average contribution if the Jason clause or an equivalent were not embodied in the bill of lading or contract of affreightment. The owners of this cargo have stated the conditions on which they are willing to come in and pay their share of the expenses. A court should be very sure that the literal meaning is not the true one before subtracting from conditions that are clear upon their face.

We are told that the provisions of the Harter Act will lead to absurdity and hardship if an unseaworthy condition is to take away from the carrier an exemption from liability for the negligence of its servants in the management of the vessel without a causal relation between the defect and the disaster. Extreme illustrations are set before us, as where there is a loose rivet in the deck, or a crack in a hatch cover, or one less messboy than required. Seaworthiness of the vessel becomes, it is said, a whimsical condition if exemption is lost through defects so unsubstantial. We assume for present purposes that the nature of the defects brought forward as illustrations is

352

sufficient to condemn a vessel as unfitted for her voyage. Even if that be so, the argument for the respondent loses sight of the value of a uniform rule that will put an end to controversy where the causal relation is uncertain or disputed. Particularly is there need of such a test where the carrier asks to be relieved from liability for conduct which without the benefit of the statute would be an actionable wrong. The maritime law abounds in illustrations of the forfeiture of a right or the loss of a contract by reason of the unseaworthiness of a vessel, though the unseaworthy feature is unrelated to the loss. The law reads into a voyage policy of insurance a warranty that the vessel shall be seaworthy for the purpose of the voyage. There are many cases to the effect that irrespective of any relation of cause and effect, the breach of the warranty will vitiate the policy. What is implied is a condition, and not merely a covenant, just as here there is not a covenant, but a condition of exemption. See *Smith* v. *Northwestern Fire & Marine Ins. Co., supra,* at p. 363, summarizing the following decisions. Thus, in *DeHahn* v. *Hartley* (1786, 1 T.R. 343; affd., 1787, 2 T.R. 186, n) a vessel was insured on a slaving voyage, " at and from Africa to her port or ports of discharge in the British West Indies," and a memorandum was inserted in the margin of the policy that the vessel had " sailed from Liverpool with fourteen six-pounders, swivels, small arms and fifty hands or upwards coppersheathed." It appeared that the ship had actually sailed from Liverpool with only forty-six men instead of fifty, but that within twelve hours of leaving Liverpool she had taken on board at Beaumaris six additional hands; and evidence was also given that the ship between Liverpool and Beaumaris was quite as safe with forty-six men as she would have been with fifty. The court unanimously held that the policy was void *in toto*. Arnould, Marine Ins., § 633. Again in *Forshaw* v. *Chabert* (1821, 3 Brod. & B. 158)

a policy was effected on a voyage " at and from Cuba to Liverpool." The captain having lost some of his outward crew by sickness and desertion in Cuba, and finding it impossible there to engage ten men, his proper complement for Liverpool, sailed from Cuba with only eight men engaged for Liverpool, and two for Montego Bay (Jamaica), where he touched and landed the two men, and whence having procured others to supply their place, he proceeded on his voyage to Liverpool. The court held (*inter alia*) that the ship was not seaworthy when she sailed from Cuba for a voyage to Liverpool, as she ought then to have had on board a full complement of men engaged for the whole voyage. Arnould, Marine Ins., § 723. Again in *Queen Marine Ins. Co.* v. *Commercial Bank of Canada* (1870, L.R. 3 P.C. 234) a vessel, covered by a voyage policy, left port with a defective boiler. She stopped at an intermediate port where the boiler was repaired. A loss occurred thereafter. The Judicial Committee of the Privy Council held, after a full review of the authorities, that the underwriters were discharged by force of the breach of warranty at the inception of the voyage.[4]

The distinction is apparent between suits such as this where the unseaworthiness of a vessel is merely a condition of exemption and suits where the unseaworthiness of a vessel is the basis of a suit for damages. In cases of the latter order there can be no recovery of damages in the absence of a causal relation between the loss and the de-

---

[4] Compare the decisions discharging insurers where there has been a wrongful deviation, irrespective of resulting damage: *Fernandez* v. *Great Western Ins. Co.*, 48 N.Y. 57; *Snyder* v. *Atlantic M. Ins. Co.*, 95 N.Y. 196; *Burgess* v. *Eq. Ins. Co.*, 126 Mass. 70; and relieving cargo owners in like circumstances from exemptions in bills of lading that would otherwise be binding: *Joseph Thorley, Ltd.* v. *Orchis S.S. Co., Ltd.*, [1907] 1 K.B. 660; *Foscolo Mango & Co., Ltd.* v. *Stag Line, Ltd.*, [1931] 2 K.B. 48; affd. *sub nom. Stag Line, Ltd.* v. *Foscolo, Mango & Co., Ltd.*, [1932] A.C. 328. *The Malcolm Baxter, Jr.*, 277 U.S. 323, 332.

fect. *The Malcolm Baxter, Jr.,* 277 U.S. 323, 333; *The Francis Wright,* 105 U.S. 381, 387. " If the unseaworthiness was not the proximate cause of the loss, it is not contended the vessel can be charged with damages." *The Francis Wright, supra.* Unseaworthiness viewed as a condition of exemption stands upon a different footing from unseaworthiness viewed as the subject of a covenant.

We are thus brought to the conclusion that the shipowner was not relieved by the Harter Act from the negligence of the pilot in the navigation of the vessel, and that for like reasons the cargo owners are not chargeable with general average contributions.

The decree is reversed and the cause remanded for further proceedings in accordance with this opinion.

*Reversed.*

MR. JUSTICE MCREYNOLDS and MR. JUSTICE BUTLER think that the court below was right and that its decree should be affirmed.