**EASTERN TRANSP. CO. v. THE NANCY MORAN et al.**

**GREENPOINT COAL DOCKS, Inc. v. EASTERN TRANSP. CO. et al.**

**THE JOAN KUNKEL.**

Nos. 17087, 17470.

District Court, E. D. New York.

June 21, 1948.

Foley & Martin, of New York City (Christopher Heckman, of New York City, of counsel), for libellant Eastern Transp. Co.

Macklin, Brown, Lenahan & Speer, of New York City (Charles J. Corrall, of New

York City, of counsel), for libellant Greenpoint Coal Docks, Inc.

Burlingham, Veeder, Clark & Hupper, of New York City (Stanley R. Wright, of New York City, of counsel), for respondent tug Nancy Moran.

J. Vincent Keogh, U. S. Atty., of Brooklyn, N. Y. (Gilbert Fleisher, of New York City, of counsel), for respondent United States.

GALSTON, District Judge.

The barge Joan Kunkel, in tow of the tug Nancy Moran from Reedy Point on the Delaware River, proceeded on March 22, 1944, down the Delaware River and Delaware Bay on a 75 fathom hawser, thence into the ocean, and passed the Delaware Breakwater and Cape May and along the coast to Sandy Hook. The hawser from the stern of the tug to the bow of the barge was then lengthened to 200 fathoms. The destination was Greenpoint, New York. The barge was heavily loaded with coal which had been taken on at Hampton Roads.

The Joan Kunkel is a wooden coastwise barge about 200 feet in length, with steering gear but no motive power.

It is the contention of the Eastern Transportation Company that the weather conditions which she encountered before reaching the sea were such as to indicate that it was unsafe for the tow to proceed to sea. This contention is based on the showing that the tow was encountering southeast winds, that the barometer after a rise had begun to fall, and the sky was overcast. It is argued that the indications were that during the night and the following day strong southeast winds would prevail, causing high or choppy seas, and that such seas would wash over the deck of the barge from starboard to port.

In addition to the charge that The Nancy Moran was not justified in going to sea on the night of March 22nd, it is maintained that good seamanship would have led the master of The Nancy Moran to proceed with the tow head to the sea as soon as the waves became high or unduly choppy, but just at what point that maneuver could

have been effectively carried out is not indicated.

On March 23, 1944, the following day, the barge leaked, and her gas pump was disabled. Sensing personal danger, the barge captain signaled to the tug at about 5:30 P.M. that he and his deckhand desired to be taken off the barge. It was at this point that the tow for the first time was headed into the seas. The anchor was dropped and the barge captain and deckhand were taken to the tug at or about 6 P.M. The tug stood by during the night, but had communicated with the Coast Guard. The Coast Guard sent a small rescue boat, then The Rescue, a large tug. During that night the wind changed to northwest. Blows from that direction, off the coast, do not have a bad effect on the seas near the coast.

If The Kunkel had been in distress before 5:20 P.M. on March 23rd, she had a duty to give notice to The Moran.

On the morning of March 24th the barge captain asked to be placed back on board his barge, and that was accomplished through the aid of the small Coast Guard boat. At that time the gas pump was repaired. It is the contention of the libellant that not much water was found in addition to that which was there when the barge men left the night before. The libellant explains that condition by asserting that the barge had been put head to sea, and thus rode more easily with less strain.

The pump was put in operation, but the rudder of The Joan Kunkel being disabled, The Nancy Moran took a position astern of the barge with a towing line from the stern to The Nancy Moran, and The Rescue proceeded to tow the flotilla with a hawser on the bow of The Joan Kunkel. Presently the strain on this hawser was apparently so great that the bow bitts were torn from their fixings. Then the hawser was moved to the side bitts. These also were damaged, but finally the barge was brought into Red Hook Flats where her cargo of coal was discharged.

By way of attempted proof of the unwisdom of The Nancy Moran in going to sea from the Delaware River and Bay on the night of the 22nd, the libellant

showed that the tug Baldrock, one of its own tugs in charge of Captain Wilgus, had reached the Delaware River on March 22, 1944, having two large barges in tow, the second of which was taken on at Reedy Point at the eastern end of the Chesapeake and Delaware Canal. The barges were loaded and the tow was bound for New York. The course was to be out to sea to the breakwater, and then up the Jersey coast to Sandy Hook. Of the two barges the forward one, The Charles J. Hooper, was about twice the size of The Joan Kunkel, and had more freeboard. The Charles T. Ryan, which followed The Charles J. Hooper, was also a larger barge than The Joan Kunkel. This tow left Reedy Point at 4:00 P.M. on March 22, 1944, and proceeded down the Delaware River. The barometer read 30.58, though at 2:33 A.M. on the 22nd it read 30.54. At 6:40 P.M. the tow passed Ship John Lighthouse; the wind moderate southeast, still partly cloudy; the water smooth; the barometer 30.54. The Ship John Lighthouse is in the Delaware River. After this tow passed the lighthouse, and at 9:15 Elbow of the Ledge Light, the wind was fresh southeast, and the sky partly cloudy; the barometer 30.50 and falling again. The weather was the same as the tow passed Myahmaull Lighthouse at 9:57. The next entry in Wilgus's log had reference to passing Fourteen Foot Bank Lighthouse at 10:45 P.M., the weather the same, barometer 30.45. At 11:30 he anchored his tow off Brandywine Lighthouse, below Fourteen Foot Bank. Wilgus' explanation was that he did not like the weather, "it was increasing, and I was afraid of a southeast gale the way the barometer was jumping back and forth, so I decided that I would not go any farther, and I would not take it to the Delaware Breakwater because the mine field extended too close to the breakwater and I had those two barges". He explained that a southeast wind on a tow proceeding up the Jersey coast from the Delaware Breakwater, bound for Sandy Hook, places the tow in the trough of the sea, washes the barge heavily and gives trouble with the rudder.

The judgment of Captain Wilgus in the handling of his tug and tow on March 22nd is not persuasive that The Nancy Moran erred. Wilgus was an interested witness. Moreover, he himself advanced reasons for his decision which are not convincing. He said he did not like the weather, and that he was afraid of a southeast gale. It would seem that the barometer readings were not very significant in support of his belief that the the weather was "increasing". The Baldrock's log for March 23rd reads:

12.40 a.m.—30.54  
2.33 a.m.—30.54  
4.00 p.m.—30.58  
6.40 p.m.—30.54  
9.05 p.m.—30.50  
10.45 p.m.—34.45  

The proximity of the mine field and the danger which might be encountered in taking his tow to that area had certainly entered into his calculations.

■ The libellant did not sustain the burden of proof that indications of heavy weather were so outstanding that a prudent navigator would decide to anchor in a protected area. Certainly the testimony of Captain McGregor, a meteorologist employed by the United States Weather Bureau, lends no support to the libellant's contention. He testified that at 2:30 A.M. on March 23rd, the wind in the area between the Delaware capes and New York was easterly, force 3.[1] So too it may be inferred from his testimony that for four and a half hours after The Moran tow had passed Overfalls, there was no indication of a probable increase in the wind. The tow had left Overfalls at 1:30 A.M. on the 23rd. Incidentally it may be remarked that on March 22nd he said that there were no indications of storms in the area referred to; nor was there any indication of storms along the Atlantic Coast on March 23rd. On March 22nd there were no storm warnings and no small craft warnings issued by the department. He explained that storm warnings are issued in connection with winds expected to exceed force 7, i. e. 32 to 38 miles an hour. On March 23rd there

---

[1] Force 3 in the Beaufort scale indicates a gentle breeze of 8 to 12 statute miles per hour, 7 to 10 nautical miles per hour.

were no storm warnings given. There were small craft warnings given. These warnings were hoisted at 6 A.M. The wind was fresh to strong east from Block Island to Cape Hatteras. In the afternoon small craft warnings were hoisted after 5 P.M. south of Block Island to Cape Hatteras, indicating fresh to strong south to southwest winds for the night shifting to west the following day.

The small craft warnings apply to fishing boats, small yachts, work on harbor improvements, etc., and were not intended for a sea-going barge such as The Joan Kunkel. Concerning the falling barometer evidenced by The Nancy Moran's log, McGregor said that that of itself meant nothing. He testified that a falling barometer between the range of 30.5 and 30.2 is not a sign of an approaching storm. Other conditions are needed on which to base a prediction of weather, as for example the direction of the wind, the location of the vessel.

The captain of The Nancy Moran, while not altogether a satisfactory witness owing to his combativeness, nevertheless left no doubt as to his integrity or competence. Describing the weather conditions on the evening of March 22nd he said that there was a moderate southeast wind and the sky was cloudy, which cleared about 9:30 P.M. In view of the clearing sky, he interpreted the falling barometer solely as indicating a change of wind to the westward. His judgment proved to be correct. The Moran mate, who went on watch at midnight of the 22nd, and remained on until 6 A.M. March 23rd, found no indication of approaching bad weather. McDonald, the second mate of The Nancy Moran, was on watch with the master, coming on duty at 6 P.M. on March 22nd and remaining on until midnight. He described the wind as moderate southeast, the sky overcast, with no indications of "approaching dirty weather".

On the issue, therefore, of prevailing weather conditions, the matter must be resolved against the libellant. See The Herkimer, 2 Cir., 52 F.2d 41; The Fred Smartley, Jr., 4 Cir., 100 F.2d 971; Eastern Tar Products Corp. v. Chesapeake Oil Transport Co., 4 Cir., 101 F.2d 30. The judgment of the master of The Nancy Moran in proceeding on the voyage was within his sound discretion, and it does not appear that he exceeded it. As Judge Learned Hand said in The Imoan, 2 Cir., 67 F.2d 603, 605, referring to the judgment of the master, "Only in case his conduct is outside the range of possible discretion, may we hold him for lack of seamanship; error to become fault must be gross and flagrant. The Eastern, 2 Cir., 280 F. 711; The Edgar H. Vance, 9 Cir., 284 F. 56, 59; The Lizzie D. Shaw, 3 Cir., 47 F.2d 820."

The more likely explanation for the cause of the damage which was sustained on this towage was the unseaworthiness of The Joan Kunkel. The certificate of inspection of the Department of Commerce showed a requirement of a crew of three, two of whom were to be able seamen. Only two manned The Joan Kunkel. How the presence of another man on the barge might have avoided damage, of course, is somewhat speculative. However, Barnes, the captain of The Joan Kunkel, admitted that after her rudder became disabled he was very busy with the pumps. The pumps became disabled about 4 o'clock in the afternoon of March 23rd, which was about an hour and a half before he hoisted the distress signal. All of the three pumps were disabled. He said that he could not get them going again with the sea aboard the barge. While he was working on the pumps the deckhand was at the wheel. Barnes said: "Sometimes in bad weather there is always two to handle the wheel in case something happens." This would seem to indicate that if a third man had been aboard he could at least have helped to handle the wheel. The deckhand was not an able seaman; at least Captain Barnes did not think he was.

McDonald, second mate on The Nancy Moran, testified as to a talk that he had had with Captain Barnes about one of the pumps. It required a hose for operation which was not on board during the trip, and when The Kunkel men were taken back to the barge, The Nancy Moran lent a section of hose to Barnes to enable him to operate one of his pumps. Captain Fargo

of The Nancy Moran testified and said that Barnes had admitted that that pump was useless without the hose. A marine surveyor who had attended a survey of The Joan Kunkel on March 29, 1944, testified to the presence of heavy scoring along the planking on the bottom planks, and that the general condition of the bottom and side planks was bad because of ice scoring. Reading some photographs he was of opinion that the construction indicated that there were openings which would permit the sea to come through, and that if such openings had been caulked tight no water would get in. On cross-examination the surveyor did admit that a vessel straining in heavy seas would be a cause of dislodging caulking. However, the depth of the scoring in the bottom planks was such as possibly to account for some of the leak. Any leakage would, of course, affect the pumps, so admitted Barnes in cross-examination.

It is very unfortunate that The Joan Kunkel's log was not produced and that no adequate explanation of the failure to produce it was given by the marine superintendent of the libellant. It is to be noted too that The Joan Kunkel instead of towing astern, stood off the tug's starboard quarter throughout most of the day of March 23rd. Even before the unfavorable sea developed, the tow was steering badly.

As has been remarked heretofore, The Joan Kunkel was heavily loaded. It carried a cargo of 1600 net tons of coal. Barnes, the barge captain, said that with 1400 gross tons the barge would be fully loaded and that would be as much as he would take in the winter time. He admitted that March is a month of strong winds and "sudden weather. You don't know what is going to happen". The barge was steering badly, even on March 22nd, while Jones of The Nancy Moran was on watch. She was then on a short hawser of 75 feet. She continued to steer badly after the hawser was lengthened to 200 feet and, said Jones, "she went off to the right there and lay there the rest of the watch. The same as if she was tied off. She just went off the full length of the hawser and lay there, the same as if her wheel was tied up. Apparently there was no one steering." He thought the wheel was lashed. The Kunkel was off The Nancy Moran's starboard quarter. Certainly that condition could have been looked after if the full complement of crew had been on the vessel. There was no showing by the Eastern Transportation Company that the absence of a third member of the crew did not contribute to the damage. See May v. Hamburg etc. (The Isis), 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348; The New York Marine No. 10 (The C. F. Coughlin), 2 Cir., 109 F.2d 564.

█ Fault cannot be ascribed to the United States of America, the respondent-impleaded. Though the Eastern Transportation Company as owner of the barge Joan Kunkel filed a libel against The Nancy Moran to recover for damages to the barge Joan Kunkel, it nevertheless appears that on the same day, at least with a check dated the same day, the Eastern Transportation Company paid to the Navy Department the full amount of its bill, dated May 5, 1944, for services rendered in assisting The Joan Kunkel at sea and in assisting the tug Nancy Moran in bringing the barge to anchor. The bill was paid without any protest. At the trial Barnes claimed that The Rescue worked her engines full speed ahead and pulled out the two main bow bitts; then after the hawser was put on the side bitts and winch, again proceeded ahead at full speed and pulled these bitts out also. But the weight of the evidence is against the Barnes version. Captain Baker, master of The Rescue, proved a reliable witness. He said that in towing the barge the tug's engines were at slow ahead, and so the entries read in the log of The Rescue at the time the barge was taken in tow. At first, after arrival at the anchored barge, Captain Baker attempted to put a hawser on The Joan Kunkel but Barnes refused to take it. In view of the danger that would have existed to passing craft—we were still at war— after Captain Baker received orders from his superior in New York, he threatened to put Barnes under arrest. So Barnes agreed to take the hawser. He said that

the hawser swept sideways on the bitts and pulled them out. That this was caused by rotten base wood seems entirely probable. Even after that Barnes failed to follow the advice of Captain Baker in respect to putting a few turns of the hawser around one side of the winch and leading the rest behind the winch and across the deck to the opposite side bitts. Thereafter the side bitts were dislodged.

Finally, however, The Kunkel was towed with the hawser on the starboard bitts to the point of destination.

In the light of the foregoing review, the libel of the Eastern Transportation Company against The Nancy Moran, claimant, and the United States of America, respondent-impleaded will be dismissed. In the companion libel Greenpoint Coal Docks, Inc. is entitled to a decree against the Eastern Transportation Company.

Concurrently with the filing of this opinion, appropriate findings of fact and conclusions of law will be filed.