## UNION CARBIDE & CARBON CORP. v. UNITED STATES.

No. 110, Docket 22504.

United States Court of Appeals Second Circuit.

Argued Dec. 4, 1952.

Decided Jan. 5, 1953.

John W. Crandall, New York City (Myles J. Lane, U. S. Atty., Hunt, Hill & Betts, and Robert M. Donohue, all of New York City, on the brief), for respondent-appellant.

John J. Killea, New York City (Hill, Rivkins & Middleton, New York City, on the brief), for libellant-appellee.

Before SWAN, Chief Judge, and CHASE and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Respondent's Liberty ship, the "Walter Raleigh," built about 1943, began a long voyage from New York on December 29, 1944, through the Mediterranean to India, Ceylon, and South and West Africa. At Takoradi, West Africa, on March 31, 1945, it took on 4,400 tons of manganese ore for transportation to Philadelphia, Pa., with libellant named as the ultimate consignee. At Port of Spain, Trinidad, on April 21 and 22, 1945, to which port it proceeded—in accordance with general directions of the War Shipping Administration for navigation during that war era—it filled its tanks with fuel oil, also pursuant to W.S.A. instructions. Upon arrival at Philadelphia, May 6, 1945, certain of the manganese was found contaminated by the oil so as to be rendered unfit for chemical use, as in the manufacture of storage batteries, although still fit for metallurgical use, as in the manufacture of ferromanganese. So the cargo owner brought this libel for the lessened value of the ore against the ship, its operating agent, and the United States as owner. The United States has assumed entire responsibility, and the action has been discontinued by stipulation so far as the agent is concerned. The parties made various stipulations, and most of the underlying facts are not disputed—though, as we shall see, enough controversy remains to leave this in the category of an appeal on the facts. Respondent concedes damage to the ore from the taking on of the oil at Trinidad, but holds the entire fault to be that occurring in the shipment of the oil, i.e., a fault of management only, for which the carrier is not responsible under the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(2)(a). But the district court, while finding such faults of management, also found a concurrent cause of the damage in the failure of respondent to use due diligence to make the ship seaworthy in the two particulars hereinafter discussed and hence liable under 46 U.S.C. § 1304(1).

The district judge, 109 F.Supp. 781, wrote a careful and reasoned opinion giving the facts in detail, and we shall content ourselves with a generalized statement only. The oil was taken from a barge hooked up to the ship's main deck fuel oil filling line. This led to the ship's No. 3 port and starboard deep tanks, whence it gravitated into the No. 5 port and starboard and No. 6 fuel oil double bottom tanks. The level was controlled by an automatic equalizing line between the No. 3 tanks. But the ship's engineer discovered a leaky gasket in a valve in this line before reaching Trinidad. The engineer did not attempt repairs, since

he deemed it a "yard repair" to be done in port at Philadelphia because of the inaccessibility of the valve. The equalizer was therefore unusable at the time because of the danger of oil fumes in the engine room. Moreover, the sounding tube leading to the No. 3 deep tank was jammed with a sounding rod or chain; it was plugged up, and attempts at clearing the tube before arriving at Trinidad were to no avail. During the filling of the tanks, the manhole covers on the tanks were taken off so that the flow of oil could be visually observed. The district court found that this was because the other means of testing were unavailing on account of the defects noted; and this is surely a justifiable conclusion. During the course of the filling the observing engineers found that one tank was filling too rapidly, and directed the pumpman first to slow down and second to stop; but the response was too slow, and the oil in the No. 3 port tank overflowed from the tank into the tween decks and caused the damage. The district court, carefully analyzing the testimony and drawing inferences from both what was said and what was not said, concluded that there was no adequate inspection of these devices when the ship was in port in New York before it left in December, 1944. It further found that there was no evidence of inspection later until the defects were discovered on the approach to Trinidad. It was upon these findings and conclusions that the court based its decision holding respondent for the damages.

 The parties differ on the time which should be considered the commencement of the voyage, when the vessel should have been placed in seaworthy condition. The precedents and reason leave no doubt that as to a particular cargo it should be when that cargo is lifted, or here at Takoradi on March 31, 1945. The Southwark, 191 U.S. 1, 13, 24 S.Ct. 1, 48 L.Ed. 65; May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft, 290 U.S. 333, 342, 54 S.Ct. 162, 78 L.Ed. 348; The President Polk, 2 Cir., 43 F.2d 695, 696, 697; The

J. L. Luckenbach, D.C.S.D.N.Y., 1 F.Supp. 692, 707, affirmed 2 Cir., 65 F.2d 570. But respondent asserts that the district judge found the voyage to have commenced in New York in December, 1944, and that libellant is bound by this determination, not having filed a cross-appeal. It is true that the court does center its discussion about the claimed inspection made at New York City, quite naturally because that is all which was before it; but we question if it intended to make a ruling of law on the issue. At least there is no discussion or citation—contrary to the full development of the remainder of the opinion. But the point seems of no decisive importance. Since we are interested in the court's decision, and not primarily in its reasons, we could accept the result in any event. Logue Stevedoring Corp. v. The Dalzellance, 2 Cir., 198 F.2d 369. And actually the conclusion becomes a fortiori, since there was no showing of any attempt at inspection or repair at Takoradi.

 Under the statutory provisions cited above, a showing of loss or damage from unseaworthiness places the burden of proving the exercise of due diligence on the carrier. We agree with the district court that respondent did not discharge its burden of showing any real inspection sufficient to constitute an exercise of due diligence to make the ship seaworthy. Ore Steamship Corp v. D/S A/S Hassel, 2 Cir., 137 F.2d 326, 329, and cases cited; Artemis Maritime Co. v. Southwestern Sugar & Molasses Co., 4 Cir., 189 F.2d 488, 492. And further, the district court's finding cannot be held "clearly erroneous," as it must be to justify reversal. Huilever, S. A. Division Huileries Du Congo Belge v. The Otho, 2 Cir., 139 F.2d 748, 749, certiorari denied American West African Line v. "Huilever" S. A. Division Huileries Du Congo Belge, 322 U.S. 735, 64 S.Ct. 1047, 88 L.Ed. 1569; Artemis Maritime Co. v. Southwestern Sugar & Molasses Co., supra, 4 Cir., 189 F.2d at page 494.

Decree affirmed.